ATTORNEYS FOR APPELLANT
Bruce N. Munson
Muncie, Indiana

William P. Tedards, Jr.
Washington, D.C.

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana



FILED
Mar 20 2012, 2:21 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 29S02-1110-PL-598

RANDALL L. WOODRUFF, TRUSTEE, U.S.
BANKRUPTCY COURT, ON BEHALF OF
LEGACY HEALTHCARE, INC. D/B/A NEW
HORIZON DEVELOPMENTAL CENTER,

*Appellant (Plaintiff below),*

v.

INDIANA FAMILY AND SOCIAL SERVICES
ADMINISTRATION, OFFICE OF MEDICAID
POLICY AND PLANNING,

*Appellees (Defendants below).*

Appeal from the Hamilton Superior Court, No. 29D05-0605-PL-01104
The Honorable Wayne A. Sturtevant, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 29A02-1002-PL-00220

**March 20, 2012**

**Shepard, Chief Justice.**

After an inspection revealed deplorable health conditions for its residents, an intermediate care facility for a particularly vulnerable segment of the population was decertified for Medicaid reimbursement. As a result, until the State appointed a receiver nine months later, it operated without receiving federal or state dollars. The instant case is a common-law claim for expenses the facility laid out in the meantime for the individuals still residing there.

A trial court denied the facility restitution for the unpaid months under a theory of quantum meruit, afforded relief under related breach of contract claims, but offset that judgment by the amount the State paid for its receiver. The net result was a wash for both sides. We affirm.

## Facts and Procedural History

To say this case has been complex would understate the matter. Counting this most recent decision, the Court of Appeals addressed issues in this action five times[1] and the U.S. District Court for the Southern District of Indiana has done so at least once.[2] We attempt to lay out the underlying procedures and facts as concisely as possible here, with more detail later as needed.

---

[1] Legacy Healthcare, Inc. v. Barnes & Thornburg, 837 N.E.2d 619 (Ind. Ct. App. 2005), reh'g denied, trans. denied; Ind. Family & Soc. Servs. Admin. v. Woodruff, 831 N.E.2d 1264 (Ind. Ct. App. 2005) (table); Ind. Family & Soc. Servs. Admin. v. Legacy Healthcare, Inc., 756 N.E.2d 567 (Ind. Ct. App. 2001); Ind. State Dep't of Health v. Legacy Healthcare, Inc., 752 N.E.2d 185 (Ind. Ct. App. 2001), reh'g denied, trans. denied.

[2] See Legacy Healthcare, Inc. v. Feldman, 2000 WL 1428667 (S.D. Ind. Mar. 8, 2000). This decision was appealed, but the Seventh Circuit's resulting opinion was not selected for inclusion in the federal reporters. Legacy Healthcare, Inc. v. Feldman, 11 Fed. App'x 589 (7th Cir. 2001).

A.  Operation of the Medicaid Statutes.  Federal statutes establish a joint federal-state scheme for administering Medicaid.  If a state chooses to participate in Medicaid programs, it must comply with those federal statutes and related regulations.  That regime requires the state to establish a Medicaid agency, through which the federal funding is channeled and the state program is administered.  42 U.S.C. § 1396a(5) (2006).  Indiana's Medicaid agency is the Indiana Family and Social Services Administration, which runs the Medicaid program through its Office of Medicaid Policy and Planning.  Ind. Code § 12-8-6-3 (2010).

A health care provider seeking to receive Medicaid funds for its services must operate under a provider agreement with the state's Medicaid agency and be subject to regular inspections by a state survey agency to determine whether the provider complies with the federal regulations governing Medicaid certification.  42 U.S.C. § 1396a(9) (2006); 42 C.F.R. § 442.12 (2011).  Indiana's survey agency is the State Department of Health.  Ind. Code § 16-28-12-1 (2008).

Of particular relevance to this case are those health care providers established as Intermediate Care Facilities for the Mentally Retarded (ICF/MR).  These facilities provide services to individuals who can be severely developmentally disabled, dangerous to themselves or others, and require such extensive medical care that they cannot function in society.  405 Ind. Admin. Code 1-1-11(1) (2008); 410 Ind. Admin. Code 16.2-1.1-33 (2008).  The FSSA's Bureau of Developmental Disabilities Services screens such individuals, establishes treatment plans for them, and places them in state or private ICF/MRs.  Ind. Code §§ 12-11-1.1-1, -2.1-4 (2004 & Supp. 2011); 405 Ind. Admin. Code 5-13-7, -8 (2008).  The ICF/MR must be capable of providing these treatments and meeting the needs of the patient before BDDS will place the patient there—in addition to the ICF/MR's obligations arising from its provider agreement with FSSA.  42 C.F.R. § 442.12(c); 405 Ind. Admin. Code 5-13-7.

3

B. The New Horizon Litigation. New Horizon Developmental Center[3] was just such an ICF/MR as described above. It was certified as such by ISDH and entered into a provider agreement with FSSA. It operated under this provider agreement until September 1, 1999. On September 2, 1999, ISDH informed New Horizon that the facility had failed an inspection and would thus lose its Medicaid certification effective September 1, 1999. New Horizon did not appeal the ISDH decision.

Following the decertification, FSSA did terminate its provider agreement with New Horizon, effective as of September 1, 1999. The notification provided that payments would continue under the provider agreement for only 30 days, or up to 120 days in the event of an appeal. Any payments beyond that point were contingent on New Horizon demonstrating reasonable attempts to transfer its resident to another certified ICF/MR. At the time of FSSA's final Medicaid payment to New Horizon on January 29, 2000, there were still 131 patients still residing at the New Horizon facility.

Neither New Horizon nor FSSA relocated those residents immediately; instead New Horizon filed for, and was denied, recertification. In November 2000, after 281 days of unfunded care, ISDH sought authority to appoint a health care receiver. The receiver—someone not employed by the State—operated the facility until the last patient was transferred in December 2001.

New Horizon petitioned for administrative review of FSSA's termination of the provider agreement, but an administrative law judge granted summary judgment in favor of FSSA because New Horizon had not appealed ISDH's inspection results in September 1999. FSSA's ultimate authority affirmed the ALJ in December 2000, and in January 2001 New Horizon

---

[3] New Horizon Developmental Center was owned by Legacy Healthcare, Inc. However, to be consistent with the briefs and prior trial and appellate court opinions in this action and those related to it, we will use "New Horizon" throughout.

sought judicial review of that decision. It was because of this administrative process that New Horizon continued receiving Medicaid payments until January 29, 2000.

In 2002, New Horizon filed for Chapter 7 bankruptcy protection and a trustee, Randall Woodruff, was substituted as the real party in interest in place of New Horizon. In 2004, a trial court reversed the final FSSA action, but on appeal by FSSA the Court of Appeals reversed and dismissed the action as moot because of New Horizon's bankruptcy. See Ind. Family & Soc. Servs. Admin. v. Woodruff, 831 N.E.2d 1264 (Ind. Ct. App. 2005) (table).

New Horizon filed this suit in 2006 with two counts: a breach of contract claim alleging that FSSA failed to pay for the care of several New Horizon residents even before the decertification, and a quantum meruit claim seeking recovery for the care costs of the 131 New Horizon residents for whom New Horizon received no Medicaid funds during the post-decertification period. FSSA filed a counterclaim, seeking a set-off for the receivership costs it had been previously ordered to pay. FSSA filed a motion for judgment on the pleadings with respect to the quantum meruit claim, and New Horizon filed a motion for summary judgment on all of its claims.

The trial court granted FSSA's motion with respect to New Horizon's quantum meruit claim, finding that New Horizon was required to exhaust its administrative remedies by following the appeal process after ISDH decertified the facility. It further found that, regardless, New Horizon was responsible for transferring its residents after decertification, not FSSA, and was therefore not entitled to payment for the care it provided. Finally, the court granted New Horizon's motion with respect to its breach of contract claim, but only as to some of the pre-decertification reimbursement claims.

Following a bench trial, the court found FSSA had breached its contract with respect to the remaining pre-decertification claims and awarded New Horizon the sum of $93,666.09. Against this, though, it allowed FSSA an equal amount as a set-off for the receivership costs. The end result was that neither party walked away owing any money.

5

New Horizon appealed the trial court's dismissal of its quantum meruit claim on exhaustion grounds, the denial of its motion for summary judgment on the quantum meruit claim, and in the application of the set-off.  Woodruff v. Ind. Family & Soc. Servs. Admin., 947 N.E.2d 934 (Ind. Ct. App. 2011).  The Court of Appeals reversed, holding that New Horizon had no administrative remedies to exhaust and that it was further entitled to summary judgment on its quantum meruit claim.  The Court of Appeals also reversed the trial court's award of a set-off.

We granted transfer, ___ N.E.2d ___ (Ind. 2011) (table), thereby vacating the opinion of the Court of Appeals.  Ind. Appellate Rule 58(A).  We now affirm the trial court.

**Standards of Review**

This case presents issues determined at all three stages of the trial process, implicating multiple standards of review.  At the earliest stage—a judgment on the pleadings—appellate courts review the trial court ruling de novo.  Murray v. City of Lawrenceburg, 925 N.E.2d 728, 731 (Ind. 2010).  A motion for judgment on the pleadings is governed by Indiana Trial Rule 12(C), and "is to be granted 'only where it is clear from the face of the complaint that under no circumstances could relief be granted.'"  Id. (quoting Forte v. Connerwood Healthcare, Inc., 745 N.E.2d 796, 801 (Ind. 2001)).

Summary judgment, in turn, is proper when the party so moving demonstrates that there is no genuine issue of material fact with respect to a particular claim or element of a claim.  Ind. Trial Rule 56(C); Town of Avon v. W. Cent. Conservancy Dist., 957 N.E.2d 598 (Ind. 2011).  Once this burden is satisfied, the non-moving party must come forward with properly designated evidence that affirmatively demonstrates a genuine issue of material fact.  Town of Avon, 959 N.E.2d at 602.  All evidence, and reasonable inferences drawn from it, must be construed in favor of the non-moving party.  Id.

6

This analysis does not change on appellate review, but we review <u>de novo</u> disputes wherein the facts are uncontroverted. We will reverse if the law has been incorrectly applied to the facts. Otherwise, we will affirm a grant of summary judgment upon any theory supported by evidence in the record. <u>Wagner v. Yates</u>, 912 N.E.2d 805, 811 (Ind. 2009).

When a case does, however, proceed to trial—as this one did on some issues—and is tried without a jury, we will not set aside the judge's findings of fact or judgment unless clearly erroneous. Ind. Trial Rule 52(A). "Findings of fact are clearly erroneous when they have no factual support in the record." <u>Nichols v. Minnick</u>, 885 N.E.2d 1, 3 (Ind. 2008). "A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." <u>Id.</u>

## I.      New Horizon Had No More Administrative Remedies to Exhaust[4]

The trial court concluded that New Horizon "was required to exhaust its administrative remedies but failed to timely appeal the survey findings that were the basis for the decertification." (App. at 24.) FSSA says that this was the "wrong agency action" for the trial court to examine in making its determination, even though New Horizon's failure to pursue administrative review at that point "created a domino effect that led to its exclusion from the Medicaid program, and resulted in Legacy's footing the bill for the care of New Horizon's residents from the cutoff of Medicaid funding in January 2000 to the start of the receivership in November 2000." (Appellee's Br. at 10–11.)

---

[4] FSSA states that its motion for judgment on the pleadings contained an affidavit that was not excluded by the trial court, and this issue therefore requires application of the summary judgment standard of review. (Appellee's Br. at 9–10.) New Horizon does not dispute this claim, and the Court of Appeals likewise applied a summary judgment standard. <u>Woodruff</u>, 947 N.E.2d at 942. We do the same here.

Nevertheless, FSSA contends, there are other agency decisions in the record that were not appealed by New Horizon either, and these failures support the trial court's decision. (Appellee's Br. at 11.) Specifically, FSSA points to evidence that New Horizon submitted regular billing statements to FSSA—even after New Horizon was decertified—utilizing the familiar Medicaid provider billing process. FSSA refused to pay these bills and, so the argument goes, because New Horizon never appealed these refusals the exhaustion doctrine should bar its claims.

New Horizon, on the other hand, claims that the rules governing Medicaid administrative appeals apply only to qualified Medicaid providers; a status it no longer held. (Appellant's Br. at 13.) Even if those procedures did apply, New Horizon says, any administrative appeal would have been futile and so the exhaustion requirement should be excused.

The exhaustion doctrine arises from the provisions of Indiana's Administrative Orders and Procedures Act, codified at Title 4, Article 21.5 of the Indiana Code. Chapter 5 of AOPA "establishes the exclusive means for judicial review of an agency action," and provides that a person aggrieved by agency action may seek judicial review "only after exhausting all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." Ind. Code § 4-21.5-5-1, -4(a) (2005).

We have often iterated the importance of adhering to this rule. It "defer[s] judicial review until controversies have been channeled through the complete administrative process . . . . avoid[s] collateral, dilatory action . . . [and] ensure[s] the efficient, uninterrupted progression of administrative proceedings and the effective application of judicial review." Austin Lakes Joint Venture v. Avon Utils. Inc., 648 N.E.2d 641, 644 (Ind. 1995) (quoting Uniroyal, Inc. v. Marshall, 579 F.2d 1060, 1064 (7th Cir. 1978)).

The procedural history reflects nothing if not multiple efforts by New Horizon to demonstrate that it could provide adequate care for such vulnerable people, and thus be paid for

8

doing so in accord with the standards of care mandated by state and federal rules. It appealed its decertification through administrative channels. It sought certification anew. The agency officials whose mission is care of the disabled were not convinced. Neither were the courts, state and federal, that reviewed these administrative decisions through two or three levels of the judiciary. None were persuaded that New Horizon could provide adequate care. New Horizon <u>had</u> exhausted a number of recognized administrative remedies, sought relief in court, and lost.

The question is thus whether it has another path to relief outside the statutes and regulations governing Medicaid.

## II. New Horizon's Quantum Meruit Claim Fails

The other path, New Horizon contends, is the common-law remedy called quantum meruit. Also called unjust enrichment or quasi-contract, the claim "is a legal fiction invented by the common-law courts in order to permit a recovery . . . where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." <u>Clark v. Peoples Sav. & Loan Ass'n</u>, 221 Ind. 168, 171, 46 N.E.2d 681, 682 (1943).

Indiana courts articulate three elements for these claims: (1) a benefit conferred upon another at the express or implied request of this other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) the plaintiff expected payment. <u>Kelly v. Levandoski</u>, 825 N.E.2d 850, 861 (Ind. Ct. App. 2005), <u>trans. denied</u>. Put another way, "a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. One who labors without an expectation of payment cannot recover in quasi-contract." <u>Bayh v. Sonnenburg</u>, 573 N.E.2d 398, 408 (Ind. 1991).

9

Our analysis, however, necessarily begins from the view that this is not the typical quantum meruit case in which there was no contract whatsoever, and one party seeks restitution for services it provides to the benefit of another. See, e.g., Bayh, 573 N.E.2d at 398; see also Kelly, 825 N.E.2d at 850. Quite to the contrary, in this case there was an explicit contract in the form of a Medicaid provider agreement. Thus, the posture of this quantum meruit action is a situation in which a contract existed, one party breached the contract, and now that same breaching party seeks restitution for services it purportedly continued providing after the contract was terminated, and for which the other party was no longer contractually obligated to pay.

At the outset, the doctrine of "unclean hands" certainly gives us pause in this circumstance.[5] After all, this was no mere technical breach of the Provider Agreement by New Horizon.

The survey report by the State Department of Health was apparently sixty-two pages long, and revealed disturbing deficiencies such as patients wearing soiled clothing, an incontinent patient wetting herself and going unnoticed by staff until ISDH's surveyor pointed it out, patients with dried feces on their backs, and flies crawling on their arms and faces. Legacy Healthcare, Inc. v. Barnes & Thornburg, 837 N.E.2d 619, 643 (Ind. Ct. App. 2005), reh'g denied, trans. denied. The report was convincing enough that the Court of Appeals used it as prima facie evidence that New Horizon could not have prevailed even if it had properly appealed the ISDH

---

[5] This doctrine is one of a number of maxims applied when deciding if a party who seeks equitable relief has behaved in a manner justifying that relief. See Wedgewood Cmty. Ass'n, Inc. v. Nash, 810 N.E.2d 346, 347 (Ind. 2004) (Rucker, J., dissenting from denial of transfer). The doctrine of unclean hands requires that "'he who seeks equity . . . come into court with clean hands'" and "'closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'" Id. (quoting ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317, 330 (1994) (Scalia, J., concurring)). "'Almost any kind of conduct the [court] may consider to be unethical or improper might suffice to bar the plaintiff's claim, even if the conduct is not actually illegal.'" Id. at 347–48 (quoting 1 Dan B. Dobbs, Law of Remedies 2.4(2) (2d ed. 1993)).

10

survey, id., and probably reflects enough wrongdoing on New Horizon's part to deny it recovery on an equitable claim flowing from that wrongful conduct. This is particularly true when the claim arises in such a highly regulated field and otherwise risks incentivizing additional facilities to follow New Horizon's lead: provide grossly substandard care to some of our state's most vulnerable citizens and then demand repayment for that care from the public coffers. Nevertheless, we also find that the claim fails on its own merits.

New Horizon contends that it is entitled to restitution "because FSSA has been unjustly enriched by accepting New Horizon's provision of care for Medicaid dependent residents from January 29, 2000 to November 6, 2000 without reimbursing or otherwise compensating Legacy, where Legacy reasonably expected to receive reimbursement." (Appellant's Br. at 15–16.) FSSA counters that New Horizon ownership was well versed and proficient in the network of rules and regulations that create the Medicaid process—including the consequences of adverse actions. (Appellee's Br. at 17.) Therefore, FSSA says, "Legacy should have known in September of 1999 that its Medicaid reimbursement was going to cease, that the 131 residents would most likely remain at New Horizon, and that Legacy would have to pay for their care." (Appellee's Br. at 18.)

The evidence does show that New Horizon could not, under any level of reasonableness, have expected payment from FSSA once it had been decertified.

The evidence shows that New Horizon's Medicaid provider agreement, establishing New Horizon as "a provider of Medicaid-covered services," imposed the following obligations on New Horizon (among others):

> 1. To continually comply with all enrollment requirements established under rules adopted by the State of Indiana Family and Social Services Administration ("IFSSA").
>
> 2. To abide by and comply with all federal and state statutes and regulations pertaining to the Medicaid Program, as they may be amended from time to time.

11

3. To continually meet the state and federal licensure, certification or other regulatory requirements for Provider's specialty including all provisions of the State of Indiana Medical Assistance law or any rule or regulation promulgated pursuant thereto.

(App. at 50.) The provider agreement also stipulates that it could be terminated "for Provider's breach of any provision of this Agreement as determined by IFSSA." (App. at 53.) It was signed by Douglas A. Bradburn, President of New Horizon. And as Bradburn states in his first affidavit, "Legacy was contracted by FSSA to provide Medicaid-covered supplies and services to these individuals who were placed in the New Horizon facility by FSSA. Under the contract, a Medicaid Provider Agreement, FSSA paid Legacy for care and services to the residents." (App. at 78.) FSSA's September 9, 1999 letter effectively terminated this contract as a result of New Horizon's breach—its failure to satisfy an ISDH inspection.

Douglas Bradburn is no mean affiant. In addition to the standard language affirming that he had personal knowledge of all the representations he gave in his affidavits as a representative of New Horizon, he stated that he had been the President of New Horizon since 1993, participated in the facility's opening in 1972, and "participated, as a party, witness and litigation assistant, in legal proceedings concerning the payment, admission and transfer of Mentally Retarded and Developmentally Disabled individuals." (App. at 93.) He was "highly proficient in the areas of State and Federal Rules and Regulations and all of the peripheral activities that go along with compliance issues and adverse actions." (App. at 94.) He had taken new facilities through the licensing and certification processes, taken part in over one thousand certification surveys, and participated in every stage—and role—of proceedings involving both ISDH and FSSA. (App. at 94.)

Further, as noted above, the Medicaid process is subject to a complex and interwoven scheme of federal and state statutes and regulations. The end result of this scheme is that the State of Indiana may provide federal Medicaid funding only to those facilities that have been properly certified by ISDH and FSSA. And if there is no federal funding for the facility, the General Assembly has declared, there can be no State Medicaid funding either. Ind. Code § 12-

12

15-5-2 (2004) ("Medicaid does not include a service or supply for which federal financial participation is not available.").

Moreover, the General Assembly has not imposed upon FSSA, its secretary, or its subordinate offices any broad, sweeping duty to pay for the long-term medical care of Medicaid-eligible individuals out of any other coffers. FSSA is charged with acting "as the agent to the federal government in . . . [t]he administration of federal money granted to Indiana to aid the welfare functions of the state," Ind. Code § 12-8-1-8(c) (2004), not to back-fill those federal monies with state funds if a provider fails to meet the federal regulatory requirements.

The closest thing to such a duty that New Horizon points us to is contained in the State Operations Manual, a document produced by the Centers for Medicare & Medicaid Services (CMS). This document states that the State's Medicaid agency "has the primary responsibility for relocating Medicaid patients and for ensuring their safe and orderly transfer from a facility that no longer participates in Medicaid to a participating facility." (Appellant's Add'l Auth. at 5.) "This is because the State remains responsible for the care and services provided to Medicaid patients." (Appellant's Add'l Auth. at 5.) It then goes on to list the considerations the State must apply in developing a transfer or relocation plan after decertifying a Medicaid facility. (Appellant's Add'l Auth. at 5–6.)

Even accepting any deference we might give to a regulatory agency like CMS, we cannot read an isolated provision in a federal handbook to trump Indiana's own statutory law prohibiting the expenditure of state funds with no federal Medicaid participation, Ind. Code § 12-15-5-2, and constitutional prohibition against the expenditure of funds from the Treasury in the absence of such statutory authorization. Ind. Const. art. 10, § 3.

This brings us back to the original point: New Horizon was led by people extremely knowledgeable about all of this. Bradburn knew the regulations and requirements needed to enter into a provider agreement, as well as the standards his facility was compelled to meet in order to comply with that agreement. He understood well the survey process and the

implications of a failed survey on a facility's continued receipt of Medicaid funds.  Moreover, he was well versed in the operation and application of the governing statutes and regulations—all of which mandate the termination of Medicaid funding (both state and federal) upon termination of a provider agreement, and none of which provide for state funding from other sources in that instance—and could not have been surprised that his post-decertification bills were denied by FSSA.

So not only could New Horizon not have reasonably foreseen payment from FSSA for its Medicaid-eligible patients after it was decertified, the evidence clearly shows that it was aware that decertification would not—could not—result in the immediate (or even reasonably fast) transfer of its Medicaid-eligible patients to other facilities by the State.  As such, New Horizon cannot succeed, as a matter of law, in its claim for quantum meruit because it cannot show that it expected payment for any services it might have provided.  We therefore affirm the trial court with respect to this issue.

Having said that, our affirmance should not be understood to mean that under different facts, timetables, and circumstances, common-law remedies might not of necessity need to intertwine to make adequate provision for developmentally impaired people whose well-being rests on actions by caregivers and public officers.  But to insert the common law in this case at this point runs a substantial risk of damaging regular Medicaid processes designed to help the disabled, and potentially creating perverse incentives for substandard behavior.

### III.       The State Is Entitled to a Set-Off

The trial court held that the State was entitled to set off the amount owed to New Horizon on the breach of contract claim against the amount the State paid in operating the receivership of New Horizon, and which New Horizon then owed.  (App. at 36–39.)  We think this is correct.

14

Indiana Code § 16-28-8-7 governs who pays the costs of a receiver's appointment in a health care facility. The version of the statute in place in 2002 provided that "[t]he costs of placing a receiver in a health facility, excluding the cost of the receiver's bond, shall be paid by: (1) the health facility, if the receiver is not a state employee; or (2) the state, if the receiver is a state employee." Ind. Code § 16-28-8-7 (Supp. 2000).[6] Moreover, in 2002 the General Assembly added Section 0.5 to this chapter, providing, "As used in this chapter, 'cost of receivership' may include the costs of placing a receiver in a health facility and all reasonable expenditures and attorney's fees incurred by the receiver to operate the health facility while the health facility is in receivership." Ind. Code § 16-28-8-0.5 (2008); see also Act of March 14, 2002, P.L. 29-2002, § 2, 2002 Ind. Acts 760–61. "Costs of placing a receiver in a health facility" had not been defined under the previous version of the statute.

New Horizon claims that the previous version of the statute "limited recovery by the State to the cost of placing a receiver in a health facility," and this did not encompass the amended language of "reasonable expenditures and attorney's fees incurred by the receiver to operate the health facility while the health facility is in receivership." (Appellant's Br. at 25–26.) New Horizon says this must be so because "[o]ne cannot reasonably assume that [the 2002 amendment] was just a 'clarification,'" because "the Legislature used the word 'and' not 'such as' or 'like' ('cost of placing a receiver in a health facility and all reasonable expenditures'), thereby distinguishing the two." (Appellant's Br. at 26). Therefore, New Horizon says, any attempt to levy costs of receivership against it, as defined by the 2002 amendment, would constitute an impermissible retroactive application of the current receivership statute. (Appellant's Br. at 26–31.)

---

[6] The current version of the statute, however, provides that "[t]he costs of the receivership shall be determined by the court and shall be paid by the owner or operator of the health facility. . . . If the receiver is a state employee, the state shall pay the receiver's salary." Ind. Code § 16-28-8-7(a)–(b) (2008).

FSSA, however, argues that the 2002 amendment was merely a clarification of prior statutory law, and thus New Horizon's retroactivity argument is irrelevant. (Appellee's Br. at 25–26.) The trial court reached the same conclusion, and so do we.

Under most circumstances, "an amendment changing a prior statute indicates a legislative intention that the meaning of the statute has changed." United Nat. Ins. Co. v. DePrizio, 705 N.E.2d 455, 460 (Ind. 1999). We presume, therefore, "that the legislature intended to change the law unless it clearly appears that the amendment was passed in order to express the original intent more clearly." Id.; see also Ind. Dep't of Revenue v. Kitchin Hospitality, LLC, 907 N.E.2d 997, 1002 (Ind. 2009) (amendment to tax code defining "tangible personal property" clarified existing law when no previous statute defined the term).

The same rudimentary analysis we used in Kitchin Hospitality, LLC applies. Prior to the 2002 amendment, there was no statutory provision defining the scope of those receivership costs that must be reimbursed to the State by a health care facility (and New Horizon points us to no other authority doing so). After the 2002 amendment, there was. "It certainly seems to us that in this case the Legislature was clarifying existing law." Id.

Because FSSA did not have any contractual or equitable obligation to pay the healthcare costs of the Medicaid-eligible patients at New Horizon during the post-decertification period, there is no bar to the State's counterclaim for a set-off pursuant to the receivership statutes.

### Conclusion

Though we reverse the trial court with respect to its findings on the issue of exhaustion, we affirm on the issues of quantum meruit and set-off. Therefore, the trial court's ultimate judgment—with neither party taking anything from the action—is affirmed.

Dickson, Sullivan, Rucker, and David, JJ., concur.

16