

FILED
Apr 17 2024, 9:01 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N  T H E

# Court of Appeals of Indiana

Andrew Nemeth Properties, LLC, and Andrew J. Nemeth,

*Appellants-Plaintiffs*

v.

William A. Panzica, Thomas C. Panzica, Philip E. Panzica, & NP3, LLC,

*Appellees-Defendants*

---

April 17, 2024

Court of Appeals Case No.
23A-PL-1383

Appeal from the Marshall Circuit Court

The Honorable Curtis D. Palmer, Judge

Trial Court Cause No.
50C01-2202-PL-2

---

**Opinion by Judge Weissmann**
Chief Judge Altice and Judge Kenworthy concur.

**Weissmann, Judge.**

[1]     Andrew Nemeth and three brothers—William, Thomas, and Phillip Panzica (the Panzica Brothers)—allegedly agreed to form a limited liability company (LLC) for the purpose of developing and leasing out a piece of commercial real estate. Nemeth filed articles of organization for the company, dubbed NP3, LLC after himself and the three Panzica Brothers. But nearly six months later, the Panzica Brothers seemingly sought to exclude Nemeth from the project by executing a backdated operating agreement for NP3 that listed the Panzica Brothers' separately owned company, Panzica Investments, LLC, as NP3's sole member. Nemeth therefore sued NP3 and the Panzica Brothers (collectively, Defendants) for breach of oral contract and unjust enrichment.

[2]     The trial court entered summary judgment in favor of Defendants on Nemeth's breach of contract claim, essentially concluding a written operating agreement is required to establish LLC membership. Nemeth's unjust enrichment claim was then tried to the bench, despite his request for a jury trial, and the court entered judgment in Defendants' favor. On appeal, Nemeth argues that an LLC's initial membership can be established by oral contract and that there exist genuine issues of material fact as to whether Nemeth and the Panzica Brothers orally agreed to form NP3 as equal members. Nemeth also argues that he was entitled to a jury trial on his unjust enrichment claim. We agree on all counts and therefore reverse.

## Facts

[3] Nemeth is a real estate consultant, broker, and developer in South Bend, Indiana.[1] The Panzica Brothers are principals in a South Bend architecture and construction corporation. They are also the sole members of Panzica Investments, LLC, a South Bend real estate holding company. Between 2012 and 2016, Nemeth and the Panzica Brothers were involved in a real estate development project initiated by NELLO Corporation, a fabricator of steel cellphone towers and utility poles. That project lies at the heart of this litigation.

[4] In 2012, Nemeth began working with NELLO to relocate its manufacturing operations to South Bend (the Nello Project). Among other things, Nemeth helped NELLO obtain approximately $13 million in economic incentives for the project. He also agreed to purchase a piece of South Bend real estate on which NELLO could construct a new manufacturing facility. NELLO initially planned to finance the construction portion of the project and to purchase the developed land from Nemeth upon the facility's completion. But in July 2014, after Nemeth had entered into a purchase agreement for the land, NELLO asked Nemeth if he would finance the construction, own the facility, and lease it to NELLO instead.

---

[1] Nemeth is also the sole member of Andrew Nemeth Properties, LLC, through which he provides his real estate services. Though Nemeth and his company are both plaintiffs/appellants in this lawsuit, we refer only to Nemeth for simplicity.

[5]     Nemeth was amenable to the leasing arrangement and soon invited the Panzica Brothers to partner with him on the Nello project. According to Nemeth, he and the Panzica Brothers orally agreed to form and be equal members of a new LLC, which would build, own, and lease to NELLO the manufacturing facility. The four members' capital contributions to the new LLC would be their respective services on the Nello Project, and they would "split" everything "equally," including distributions. App. Vol. IV, pp. 153-54, 180.[2]

[6]     In August 2014, Nemeth emailed the Panzica Brothers a proposed name for the new company, "NP3, LLC," derived from the names "Nemeth" and "Panzica" (there being three of the latter). *Id.* at 180. A month later, Nemeth officially formed NP3, LLC by filing articles of organization with the Indiana Secretary of State. These articles did not identify NP3's membership but indicated that the company would be managed by its "Members." App. Vol. III, p. 25.

[7]     In October 2014, NELLO entered into a 15-year lease with NP3 for the forthcoming manufacturing facility. William Panzica signed the lease on NP3's behalf, and his signature block identified him as a "Member" of the company. *Id.* at 185. The lease also contained a Real Estate Broker's Disclosure, which provided: "It is hereby disclosed and accepted that Landlord [NP3] includes among its members licensed Indiana Real Estate Brokers including Thomas C. Panzica, William A. Panzica[,] and Andrew J. Nemeth." *Id.* at 184.

---

[2] All citations to the Appendix in this opinion refer to Appellants' Appendix.

[8] To expedite financing for the Nello Project, Nemeth and the Panzica Brothers decided that Panzica Investments would purchase the land for which Nemeth already had a purchase agreement and then transfer the land to NP3. In an October 2014 email to a title company representative involved in the land purchase, William Panzica advised that "NP3, LLC (Nemeth and the 3 Panzica Brothers)" would ultimately be buying the land. App. Vol. IV, p. 226.

[9] In November 2014, Nemeth assigned his purchase agreement for the land to Panzica Investments. But according to Defendants, Nemeth had for months concealed the fact that the purchase agreement entitled him to a $256,000 broker's fee. When the Panzica Brothers allegedly learned about the fee in December 2014, they believed it was too late to withdraw from the Nello Project without subjecting themselves to certain liabilities. Therefore, Panzica Investments proceeded to close on the land two weeks later and eventually transferred the land to NP3, as intended.

[10] At some point, the Panzica Brothers decided to proceed with the Nello Project without Nemeth. And on or after February 20, 2015, William Panzica prepared a written operating agreement for NP3 that identified Panzica Investments as NP3's sole "initial member." *Id.* at 133. The agreement was backdated to January 1, 2015, and it listed a retroactive effective date of September 12, 2014—the day NP3 was organized. William executed the agreement on behalf of Panzica Investments, and all three Panzica Brothers signed it as NP3's managers.

[11]     Fast forward to 2020. Nemeth filed a complaint against Defendants, seeking a declaratory judgment that he was a member of NP3 and asserting claims for breach of oral contract and unjust enrichment, among other things.[3] Defendants moved for summary judgment on Nemeth's declaratory judgment and breach of contract claims, designating the written operating agreement that identified Panzica Investments as NP3's sole member. The trial court granted Defendants' motion, finding: "There is no written operating agreement naming [Nemeth] as a member and there is no written consent from all of the members of [NP3] for him to become a member as is required by [Indiana Code §] 23-18-6-1(a)(1)." App. Vol. II, p. 23.[4]

[12]     The case then proceeded to trial on Nemeth's unjust enrichment claim. Though Nemeth timely requested a jury trial on this claim, the trial court sua sponte ordered a bench trial. At that trial, Defendants denied being unjustly enriched and also argued that Nemeth's alleged concealment of his broker's commission barred any recovery under the doctrine of unclean hands. The trial court ultimately entered judgment in Defendants' favor, concluding Nemeth failed to prove his unjust enrichment claim and, alternatively, that Defendants successfully proved Nemeth had unclean hands.

---

[3] Nemeth's complaint asserted three other claims, which sought: (1) an injunction compelling distributions from NP3; (2) compensation for his efforts in procuring the NELLO lease; and (3) damages for conversion. Nemeth voluntarily dismissed his conversion claim, and the trial court entered summary judgment in favor of Defendants on the other two.

[4] None of the parties appear to have asked the trial court to certify its partial summary judgment as a final judgment under Indiana Trial Rules 54(B) or 56(C).

## Discussion and Decision

[13] Nemeth appeals the trial court's summary judgment on his breach of contract claim as well as the court's bench trial judgment on his unjust enrichment claim. We find reversible error in both.

## I. Breach of Contract Claim

[14] Our analysis begins with the trial court's entry of summary judgment in favor of Defendants on Nemeth's breach of contract claim. "We review a summary judgment ruling de novo, applying the same standard as the trial court." *Arnette v. Estate of Beavins*, 184 N.E.3d 679, 687 (Ind. Ct. App. 2022). Summary judgment is appropriate only if "the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). In conducting our review, "[w]e construe all factual inferences in the nonmoving party's favor, and all doubts as to the existence of a material issue against the moving party." *Fox v. Barker*, 170 N.E.3d 662, 665-66 (Ind. Ct. App. 2021).

[15] Nemeth argues that summary judgment on his breach of contract claim was inappropriate because: (1) a pre-formation oral contract may establish an LLC's initial membership under Indiana's Business Flexibility Act; and (2) the evidence designated on summary judgment established a genuine issue of material fact as to whether Nemeth and the Panzica Brothers orally agreed to form NP3 as equal members. We agree as to both issues.

## A.   A Pre-formation Oral Contract May Establish a Limited Liability Company's Initial Membership

[16]   Codified as Article 18 of Title 23 of the Indiana Code, the Business Flexibility Act controls the creation, operation, and dissolution of LLCs in Indiana. *Brant v. Krilich*, 835 N.E.2d 582, 592 (Ind. Ct. App. 2005). The Act's stated policy is "to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements of limited liability companies." Ind. Code § 23-18-4-13. Case law applying its provisions is sparse, but the Act reveals the following principles regarding LLC formation.

[17]   First, nothing more than the filing of articles of organization is required to form an LLC. Ind. Code § 23-18-2-4(a) ("At least one (1) person may form a limited liability company by causing articles of organization to be executed and filed for record with the office of the secretary of state."); Ind. Code § 23-18-2-7 ("The fact that articles of organization of a limited liability company are on file in the office of the secretary of state is notice that the limited liability company has been organized.").

[18]   Second, an LLC must have at least one member at the time of formation. *See* Ind. Code § 23-18-6-0.5 ("A limited liability company formed under this article . . . may have at least one (1) member."); Ind. Code § 23-18-9-1.1(c) ("A limited liability company is dissolved and the limited liability company's affairs must be wound up if there are no members.").

Third, the person who executes and files an LLC's articles of organization need not be a member of the company. Ind. Code § 23-18-2-4(a) ("A person does not need to be a member of the limited liability company at the time of formation or after formation has occurred.").

Fourth, an LLC's articles of organization need not identify the company's initial membership. *See* Ind. Code § 23-18-2-4(b) (requiring articles of organization to include only the LLC's name, the address of its registered office, the name of its registered agent, its dissolution date or a statement of its perpetual duration, and a statement of whether it will have a manager or managers).

These principles collectively beg the question: How is an LLC's initial membership established? Nemeth argues that a pre-formation oral contract is sufficient. Defendants contend, as the trial court concluded, that the Act requires a written instrument.

Defendants point to Indiana Code § 23-18-1-15, which defines "member" as "a person admitted to membership in a limited liability company under IC 23-18-6-1 . . . ." Defendants in turn rely on Indiana Code § 23-18-6-1, which provides, in pertinent part:

> [A] person may become a member in a limited liability company . . . in the case of a person acquiring an interest directly from the limited liability company, upon compliance with the operating agreement or if the operating agreement does not provide in writing, upon the written consent of all members.

Ind. Code § 23-18-6-1(a)(1) (Membership Acquisition Statute).

[23] The problem with Defendants' argument is that the Membership Acquisition Statute presupposes the existence of LLC members. Without existing members to either execute a written operating agreement or provide their written consent, a membership interest cannot be acquired directly from the LLC under the statute. Indeed, Indiana Code § 23-18-4-6(a) provides, "The initial operating agreement must be agreed to by all persons who are members at the time the initial agreement is accepted." *See generally* Ind. Code § 23-18-1-16 (defining "operating agreement" as "any written or oral agreement of the members as to the affairs of a limited liability company and the conduct of its business that is binding upon all the members").

[24] We therefore conclude the Membership Acquisition Statute does not control the establishment of an LLC's initial membership. Moreover, we find no provision in the Act that specifically addresses the initial membership issue. This apparent omission seems to have originated in the American Bar Association's Prototype Limited Liability Company Act (Prototype Act), on which Indiana's Business Flexibility Act was later based, in part. David C. Worrell & Marci A. Reddick, *The Indiana Business Flexibility Act (Limited Liability Companies)*, 27 Ind. L. Rev. 919, 925-26 (1994).

[25] The Membership Acquisition Statute is identical to Prototype Act § 801. Prototype Ltd. Liab. Co. Act § 801 (1992), *reprinted in* 3 Ribstein and Keatinge on Limited Liability Companies app. C (2d ed. 2014). And Prototype Act § 801

was based on a provision in Georgia's Revised Uniform Limited Partnership Act (GRULPA). *Id.* § 801 cmt. Specifically, GRULPA § 301 provides:

> [A] person may become a limited partner in a limited partnership . . . [i]n the case of a person acquiring a partnership interest directly from the limited partnership, upon compliance with the partnership agreement or, if the partnership agreement does not so provide in writing, upon the written consent of all partners.

Ga. Code § 14-9-301 (1988).

Like the Membership Acquisition Statute, GRULPA § 301 presupposes the existence of partners to either execute a written partnership agreement or provide their written consent to a person's acquisition of a limited partnership interest directly from the limited partnership. But unlike the Membership Acquisition Statute, GRULPA expressly provides for the establishment of initial partners at the time of a limited partnership's formation. *See* Ga. Code § 14-9-101(9) (defining "partner" to include a "general partner"); *id.* § 101(5)(A) (defining "general partner" as a person who "[b]ecomes a general partner upon the formation of a limited partnership . . . ."); *id.* § 201(a) (requiring nothing more than the filing of a "certificate of limited partnership" to form a limited partnership); *id.* § 201(a)(3) (requiring the certificate of limited partnership to

identify "[t]he name and the business address of each general partner.").[5]

[27] Without a provision in the Business Flexibility Act that specifically addresses the initial membership issue, we have only the formation principles set forth above to guide us. Most notable among them is that an LLC must have at least one member at the time of its formation. *See* Ind. Code § 23-18-6-0.5; Ind. Code § 23-18-9-1.1(c). From this, we conclude an LLC's initial membership must be established before the company's formation. And considering that the Act's stated policy is, in part, "to give the maximum effect to the principle of freedom of contract," Ind. Code § 23-18-4-13, we see no reason why a pre-formation oral contract cannot be the means of establishing that membership.

## B. Genuine Issues of Fact Remain as to the Existence of a Pre-formation Oral Contract

[28] As for the existence of a pre-formation oral contract in this case, the designated evidence included Nemeth's deposition testimony that he and the Panzica Brothers orally agreed to form NP3 as equal members. According to Nemeth, the four members' capital contributions to the new LLC would be their respective services on the Nello Project, and they would "split" everything

---

[5] Notably, the American Bar Association's Revised Prototype Limited Liability Company Act includes separate provisions for admitting a person as an LLC member "[i]n connection with the formation" of the company and "after formation" of the company. Revised Prototype Ltd. Liab. Co. Act § 401 (2011), *reprinted in* 3 Ribstein and Keatinge on Limited Liability Companies app. G.

"equally," including distributions. App. Vol. IV, pp. 153-54, 180. The evidence also included:

- NP3's articles of organization, indicating that the LLC would be managed by its "Members," plural, App. Vol. III, p. 25;

- William Panzica's email to the title company representative advising that "NP3, LLC (Nemeth and the 3 Panzica Brothers)" would ultimately be buying the land, App. Vol. IV, p. 226; and

- The NELLO lease, which was signed by William as a "Member" of NP3 and contained a Real Estate Broker's Disclosure that also identified Nemeth and Thomas Panzica as NP3 members, App. Vol. III, 184-85.

This evidence establishes a genuine issue of fact as to the existence of Nemeth's alleged oral contract with the Panzica Brothers to form NP3 as equal members.

[29] Defendants claim Nemeth was required to designate evidence that he and the Panzica Brothers orally agreed to terms regarding the agreed value of their respective capital contributions and the allocation of NP3's profits and losses. *See generally Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005) ("If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed.").

[30] But such things are not essential to an LLC's formation. Ind. Code § 23-18-2-4(a); *see* Ind. Code § 23-18-4-8(a), (e) (generally requiring LLC to document agreed value of members' capital contributions while also indicating that failure to comply has no effect on LLC formation or membership status); Ind. Code § 23-18-4-5(2) (stating "[m]embers *may* enter into an operating agreement to . . .

establish . . . [t]he manner in which the members will share in distributions of the assets and the profits or losses of the limited liability company" (emphasis added)). Thus, we conclude the agreed value of each member's capital contributions and the allocation of profits and losses were not terms essential to Nemeth's alleged oral contract with the Panzica Brothers to form NP3.

[31] Because there exists a genuine issue of a material fact as to Nemeth's breach of oral contract claim, the trial court erred by granting Defendants' motion for summary judgment thereon.

## II. Unjust Enrichment Claim

[32] Turning to the trial court's bench trial judgment on Nemeth's unjust enrichment claim, Nemeth argues that the court violated his right to a jury trial under the Indiana Constitution. Article 1, Section 20 provides that, "[i]n all civil cases, the right of trial by jury shall remain inviolate." Ind. Const. art. 1, § 20. As our Supreme Court recently observed, "[t]his fundamental guarantee secures the right to a jury trial as it existed at common law at the time Indiana adopted its current constitution." *$2,435 in U.S. Currency*, 220 N.E.3d 542, 545 (Ind. 2023) (internal quotation omitted). For cases or claims tried in equity at that time, "it is a well-settled tenet that a party is not entitled to a jury trial." *Id.*

[33] Indiana Trial Rule 38(A) embodies this principle, stating in pertinent part: "Issues of law and issues of fact in causes that prior to the eighteenth day of June, 1852, were of exclusive equitable jurisdiction shall be tried by the

court[.]" Thus, to determine whether Article 1, Section 20's jury-trial right applies in a particular case,

> we first ask whether the cause of action existed in 1851. If so, then history settles the matter. But if the cause of action did not exist in 1851, we must decide whether the claim is analogous to one at law or one in equity, as those terms were then understood.

*$2,435 in U.S. Currency*, 220 N.E.3d at 545 (internal citations omitted). "Whether certain claims are entitled to a trial by jury presents a pure question of law to which we apply a de novo standard of review." *Id.* (internal quotation omitted).

[34] Nemeth argues that he was entitled to a jury trial on his unjust enrichment claim because it sought legal relief, in the form of damages, based on a theory of contract implied-at-law. Nemeth also claims the trial court's finding of unclean hands did not render harmless the court's failure to conduct a jury trial because the equitable doctrine of unclean hands is not available as a defense to a legal claim in Indiana. Again, we agree with Nemeth on both issues.

## A. Nemeth Was Entitled to a Jury Trial on His Unjust Enrichment Claim

[35] Nemeth's unjust enrichment claim incorporated the operative factual allegations of his complaint, including the following:

> In addition to originating the deal over the course of multiple years and then inviting the Panzicas to participate, Andrew Nemeth and Nemeth Properties contributed the value of their brokerage, financial, and development services in procuring the

> lease with Nello Corporation and in overall development with Nello Corporation.

App. Vol. II, p. 51. Nemeth's claim further alleged: "A measurable benefit has been conferred on the defendants by Andrew J. Nemeth" and "[u]nder the circumstances, the defendants' retention of the benefit without payment would be unjust." *Id.* at 55.

[36] As Nemeth contends, the theory underlying his unjust enrichment claim is that of contract implied-at-law, also known as quasi-contract and quantum meruit. *See Woodruff v. Ind. Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 791 (Ind. 2012) (stating that, to prevail on such a theory, "a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust").

[37] This Court long ago recognized that contract implied-at-law, quasi-contract, and quantum meruit were "triable at law and not in equity" in 1851; therefore, a claimant was "entitled to jury trial upon them." *Nehi Beverage Co. v. Petri*, 537 N.E.2d 78, 85 (Ind. Ct. App. 1989). Indeed, our own research reveals that a court of law, not a court of chancery, was the "proper tribunal" to resolve a claim in the "nature of a *quantum meruit*" before Indiana adopted its current constitution in 1852. *McKinney v. Springer*, 6 Blackf. 511, 515 (1843).

[38] Defendants cite several cases for the proposition that unjust enrichment is an "equitable doctrine." *See, e.g.*, *Galanis v. Lyons & Truitt*, 715 N.E.2d 858, 861

(Ind. 1999) ("Quantum meruit is an equitable doctrine that prevents unjust enrichment . . . ."). But none concerned whether the claimant was entitled to a jury trial on the issue. Moreover, our Supreme Court has more recently explained that quantum meruit "is a legal fiction invented by the common-law courts in order to permit a recovery where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise." *Woodruff*, 964 N.E.2d at 791 (cleaned up) (quoting *Clark v. Peoples Sav. & Loan Ass'n*, 221 Ind. 168, 171, 46 N.E.2d 681, 682 (1943)).

[39] As similarly explained in *Nehi*, contract implied-at-law, quasi-contract, and quantum meruit are "*legal* fictions." 537 N.E.2d at 85 (emphasis in original). The theories were created by courts of law "to prevent unjust enrichment, thereby promoting justice and equity." *Id.* But they provide a distinctly legal remedy—money damages. *Id.* "Unjust enrichment . . . is but the equitable *reason* for requiring payment for value of goods and services received." *Id.* (emphasis in original).[6]

---

[6] "The confusion with equity emanates from the decision of the King's Bench in 1760 in the case of *Moses v. Macferlan*, 2 Burr. 1005, 97 Eng. Rep. 676, where Lord Mansfield stated that the defendant's [quasi-contract] obligation came 'from the ties of natural justice' founded in 'the equity of the plaintiff's case.'" *Partipilo v. Hallman*, 510 N.E.2d 8, 11 (Ill. Ct. App. 1987) (citing George E. Palmer, 1 *Law of Restitution* at 7-8 (1978)). "[T]he statement concerning the action of quasi-contract being equitable has been repeated many times, but merely refers to the way in which a claim should be approached 'since it is clear that the action is at law and the relief given is a simple money judgment.'" *Id.* (quoting Palmer, *supra* at 9).

[40] Accordingly, we conclude Nemeth was entitled to a jury trial on his unjust enrichment claim under Article 1, Section 20 of the Indiana Constitution.

## B. The Denial of Nemeth's Right to a Jury Trial Was Not Harmless Error

[41] Defendants argue that the failure to hold a jury trial on Nemeth's unjust enrichment claim was harmless error. To evaluate harmlessness in this context, we consider "whether the trial court would have been required to enter a directed verdict had a jury trial been held, or whether a jury verdict in favor of the losing party could have been sustainable." *Corrigan v. Al-Trim Corp.*, 700 N.E.2d 481, 484 (Ind. Ct. App. 1998); *accord Midwest Fertilizer Co. v. Ag-Chem Equip. Co.*, 510 N.E.2d 232, 235 (Ind. Ct. App. 1987).

[42] Defendants do not contest that a jury could have found in Nemeth's favor on his unjust enrichment claim. Rather, they claim the trial court would have been required to enter judgment in their favor based on its finding that Nemeth's unclean hands precluded his recovery. According to Defendants, "unclean hands is an equitable doctrine decided by the court and may defeat both equitable and legal claims." Appellees' Br. p. 41. We disagree with the latter proposition.

[43] "[The unclean hands] doctrine is one of a number of maxims applied when deciding if a party who seeks *equitable relief* has behaved in a manner justifying that relief." *Woodruff v. Ind. Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 792 n.5 (Ind. 2012) (emphasis added). It requires that "he who seeks equity come into

court with clean hands and closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.* (internal quotations and ellipses omitted).

[44] Of course, Indiana has long since abolished courts of equity and, with them, the distinction between actions at law and suits in equity. *See generally Denny v. State*, 203 Ind. 682, 182 N.E. 313, 316 (1932); *see also* Ind. Trial Rule 2(A) ("There shall be one [1] form of action to be known as 'civil action.'"). But the equitable doctrine of unclean hands has not crossed over to be available as a defense to a legal claim in Indiana. In both *Elwood v. Parker*, 77 N.E.3d 835, 838 (Ind. Ct. App. 2017), and *Bayview Loan Servicing, LLC v. Golden Foods, Inc.*, 59 N.E.3d 1056, 1070 (Ind. Ct. App. 2016), this Court held that the unclean hands doctrine did not apply to a claimant seeking *legal relief. See generally Am. Healthcare Admin. Servs.*, *Inc. v. Aizen*, 285 A.3d 461, 485-93 (Del. Ch. 2022) (exploring the historical evolution of the unclean hands doctrine and evaluating its "moderate but not universal success in crossing the equity-law divide").

[45] Our Supreme Court also hinted at the unavailability of uncleans hands as a defense to a legal claim in *Woodruff*, a quantum meruit case in which an intermediate care facility sought to recover Medicaid funds for care the facility gave its residents after losing its Medicaid certification due to "deplorable health conditions." 964 N.E.2d at 787. Though recognizing the facility's claim as a "common-law remedy," the Court stated: "At the outset, the doctrine of 'unclean hands' certainly gives us pause." *Id.* at 792. The Court then noted that

the record "probably reflects enough wrongdoing on [the facility's] part to deny it recovery on an *equitable claim* flowing from that wrongful conduct." *Id.* (emphasis added). But the Court ultimately held that the facility's quantum meruit claim failed as a matter of law because the facility could not show that it expected Medicaid payments for any services it provided post decertification. *Id.* at 794.

[46] For the foregoing reasons, the trial court committed reversible error by sua sponte ordering a bench trial on Nemeth's unjust enrichment claim.

## Conclusion

[47] We reverse both the trial court's entry of summary judgment in favor of Defendants on Nemeth's breach of contract claim and its bench judgment in favor of Defendants on Nemeth's unjust enrichment claim.

Altice, C.J., and Kenworthy, J., concur.

ATTORNEYS FOR APPELLANT

Carol Nemeth Joven
Ronald J. Waicukauski
Williams Law Group, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

John D. LaDue
Jonathan S. Lawson
SouthBank Legal LLC
South Bend, Indiana