

**FILED**

Sep 14 2016, 8:31 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael J. Cork
Jamie B. Dameron
Bamberger, Foreman, Oswald & Hahn, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Robert C. Beasley
Beasley Law Office
Muncie, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Bayview Loan Servicing, LLC,

*Appellant-Plaintiff and Counter-Defendant,*

v.

Golden Foods, Inc., and Lewis R. Coulter,

*Appellees-Defendants and Counterclaimants.*

September 14, 2016

Court of Appeals Case No.
18A02-1508-MI-1191

Appeal from the Delaware Circuit Court

The Honorable Thomas A. Cannon, Jr., Judge

Trial Court Cause No.
18C05-1011-MI-39

**Pyle, Judge.**

## Statement of the Case

[1] Bayview Loan Servicing LLC ("Bayview") appeals the trial court's order

entering judgment in favor of Golden Foods, Inc., ("Golden Foods") and Lewis

Coulter ("Coulter") on Bayview's mortgage foreclosure claim and Golden Food's conversion counterclaim. Bayview argues that there is insufficient evidence that it intended: (1) for Golden Food's mortgage to merge with the tax deed that Bayview purchased from M. Jewell, LLC ("Jewell"); and (2) to exert unauthorized control over Golden Foods' property and monthly payments. Concluding that Bayview's arguments are requests to reweigh the evidence and that there is sufficient evidence that Bayview intended both the merger and the exercise of unauthorized control, we affirm the trial court.

We affirm.

## Issues

1. Whether the trial court's judgment in favor of Golden Foods on Bayview's mortgage foreclosure claim is contrary to law; and

2. Whether the trial court's judgment in favor of Golden Goods on its conversion counterclaim is clearly erroneous.

## Facts

Coulter is the president and sole shareholder of Golden Foods, which is an Indiana Corporation. In 1988, he executed an adjustable rate note with Industrial Trust and Savings Bank, ("the Note"). To secure payment for the $113,800.00 Note, Golden Foods executed a mortgage against a commercial property on Madison Street ("Madison Street Property") in Muncie, which Colter operated as a restaurant. As further security for Golden Foods' indebtedness under the Note, Coulter and Golden Foods executed a mortgage

against Coulter's home on Oliver Drive, ("Oliver Drive Mortgage").[1]  Both mortgages were assigned to Bayview in 2005.[2]

[4]     By 2008, Golden Foods had reduced the balance of the Note to $42,822.77. However, Golden Foods had become delinquent in the payment of real estate taxes on the Madison Street Property, which had been vacant and non-income producing since 2006.  In April 2008, Golden Foods advised Bayview that it was unable to pay the $22,000.000 in overdue taxes on the property.  A Bayview representative recommended that Coulter:  (1) submit a letter of hardship; and (2) request that Bayview advance him the money to pay the delinquent taxes and modify his mortgage payment to include the advance. Coulter explained that he did not know if he could afford a payment modification because the only money he had available to make his current mortgage payment was his monthly retirement income.  Coulter also advised the Bayview representative that he was making repairs on the property in order to sell it.  In December 2008, Coulter sent Bayview a hardship letter, which stated that Coulter's only income available to pay the mortgage loan was from Social Security.

[1]  Although the Oliver Street Mortgage named Golden Foods as the mortgagor, Golden Foods did not hold title to the Oliver Street Property.

[2]  Bayview is a Delaware limited liability company with a Florida mailing address that has over 1,700 employees and services over 120,000 mortgage loans at any given time.

Three months later, Bayview decided not to advance Coulter the funds to pay the delinquent taxes. Rather, Bayview decided that it would attempt to work out a tax capitalization agreement with Golden Foods. Meanwhile, because of the delinquent taxes, the Madison Street Property was offered at a Fall 2008 tax sale. M. Jewell, LLC ("Jewell") purchased the tax sale certificate for the Madison Street Property for $8,001.00. Jewell sent notice of the sale to Golden Foods, which immediately notified Bayview of the situation. Jewell, however, did not send the required notice to Bayview. The redemption period was scheduled to expire on January 6, 2009.

Following the tax sale, Bayview completed an internal assessment to identify, value, and prioritize its options regarding the Madison Street Property, which included loan modification, foreclosure, or acquiring the property as real estate owned property ("REO property").[3] Bayview's internal valuation of the Madison Street Property was $140,000.00, and Bayview had received a broker's price opinion that the property was in a "hot pocket area with potential." (BLS-412).[4] Bayview's assessment disclosed that the best option for Bayview was to capitalize the taxes and enter into a loan modification agreement with Golden Foods. The net present value of this scenario to Bayview was $84,676.15. The

---

[3] Real estate owned property is property acquired by the lender in satisfaction of a debt, usually through foreclosure. BLACK'S LAW DICTIONARY 1292 (8th ed. 2004).

[4] The first two volumes of exhibits are paginated using "BLS-."

second best alternative for Bayview was to acquire the property as an REO property. The net present value of this scenario to Bayview was $54,504.12.

[7] After considering the options, Bayview drafted and proposed a Loan Adjustment Agreement (LAA) to Golden Foods. Pursuant to the terms of the LAA, Golden Foods had to make a $1,000.00 down payment and a $1,218.55 monthly payment.[5] With the additional capitalization, Bayview agreed to redeem the Madison Street Property from the tax sale and include approximately $12,900.00 to fund the new escrow account for future taxes and insurance. Coulter signed the LAA individually and on behalf of Golden Foods and returned it to Bayview with the $1,000.00 fee on December 26, 2008. According to the LAA, which Bayview never signed, the first payment was due February 1, 2009.

[8] In the meantime, although Bayview knew the redemption deadline for the Madison Street Property was January 6, 2009, Bayview failed to redeem the property. Therefore, Jewell immediately filed a petition for issuance of a tax deed. Realizing that if the tax sale was not set aside, Golden Foods would lose title, and Bayview would likely be liable for damages, Bayview hired Indiana counsel Jason Lueking ("Lueking") to defend its interests and intervene in the tax sale proceeding. Lueking immediately noticed that Jewell had failed to give the required notice to Bayview. Therefore, both Bayview and Golden Foods

---

[5] Although the LAA decreased Golden Foods' monthly mortgage payment to Bayview from $859.67 to $396.50, the payment also included an $822.05 monthly escrow payment for taxes and insurance.

had the right to object to the issuance of the tax deed and to seek to set aside the tax sale. With these rights in mind, Lueking entered into negotiations with Jewell.

[9] During the course of the negotiations, Lueking structured a deal to change Bayview's status from mortgage lienholder of the Madison Street Property to fee simple owner. Specifically, Lueking's settlement draft passed title of the Madison Street Property directly from Jewell to IB Property Holdings ("IB Property"), which is a subsidiary of Bayview that takes title to REO Properties acquired through either foreclosure or a deed in lieu of foreclosure.[6] When title is passed to IB Property, the property is sold, and any sale proceeds are kept by the lender. This differs from a foreclosure where any excess funds become the property of the borrower. Lueking did not advise Golden Foods about these negotiations with Jewell or suggest that Golden Foods obtain counsel.

[10] In April 2009, Bayview expressed concerns to Lueking about taking title to the Madison Street Property in its name or in the name of IB Property. Bayview was considering an alternative structure, which would have given the tax title deed directly to Jewell. Jewell would then have quitclaimed the property to

---

[6] "A deed in lieu of foreclosure is an alternative to foreclosure. In a deed in lieu of foreclosure, the property owner gives the property to the lender voluntarily in exchange for the lender canceling the loan. The item transferred is the deed to the property. The lender promises not to initiate foreclosure proceedings and to terminate any foreclosure proceedings already underway. The lender may or may not agree to forgive any deficiency balance that results from the sale of the property." www.bills.com/a-deed-in-lieu-of-foreclosure-vs-a-short-sale. (last visited 8/23/2016).

Golden Foods. This alternative would have returned Bayview and Golden Foods to the relationship contemplated by the LAA. Lueking revised the settlement documents to reflect this structure for the transaction and provided them to Lawrence Halpern, Bayview's vice president and in-house counsel ("Halpern"). However, these documents were never presented to Jewell.

[11] Rather, in May 2009, Lueking sent a revised settlement agreement to Jewell. This agreement had the tax certificate and tax title deed going directly to Bayview. In an email, Lueking explained to Jewell's attorney that the "transaction [was] similar to a deed in lieu of foreclosure from [Bayview's] perspective." (Bayview Ex. 49). Halpern was copied on Lueking's email to Jewell's attorney. Lueking understood that a deed in lieu of foreclosure meant that Bayview was acquiring title to and equity in the property rather than initiating foreclosure proceedings. Both Lueking and Bayview Vice President of Commercial Servicing, Jo Ann Snyder ("Snyder"),[7] knew that a deed in lieu of foreclosure would extinguish Golden Foods' underlying debt unless the parties contemporaneously executed documentation to establish a residual financial obligation on the borrower. However, no such documentation was ever prepared or submitted to Golden Foods.

[12] On June 4, 2009, before finalizing the agreement with Jewell, Bayview ran another internal assessment, which revealed that the Madison Street Property

---

[7] Snyder was not involved in the settlement negotiation process with Jewell. Rather her sole involvement in the case involved signing affidavits in support of Bayview's summary judgment motion.

had a present value of $64,933.74 to Bayview if Bayview took the property as an REO property. This value was based on Bayview's $140,000 valuation of the Madison Street Property minus Bayview's invested funds, which included the $42,822.77 mortgage principal at the time of the LAA and the $32,469.75 paid to Jewell. Bayview Vice President Gyselle Piedra ("Piedra") authorized the settlement agreement, which Bayview signed that day.

[13] That same day, Bayview employee, Juan Gonzalez ("Gonzalez"), told Coulter that Bayview was going to pay the delinquent taxes on the Madison Street Property and that Coulter could proceed with his plans to sell it. Four days later, Gonzalez told Coulter that the taxes had been paid but did not mention that Bayview had taken title to the property. Bayview also continued to send Golden Foods monthly LAA statements.

[14] The very next day, the agreed order directing the tax deed to be issued was entered, and the tax deed was issued to Bayview on July 8, 2009. In August 2009, Gonzales issued an order to secure the unoccupied Madison Street Property, winterize the pipes, and change the locks. Bayview still did not advise Coulter that it had acquired title to the property. Golden Foods began making the $1,218.55 per month LAA payments in November 2009. Golden Foods made ten payments on the LAA, all of which Bayview accepted even though Bayview had never signed the LAA.

[15] Golden Foods did not learn that Bayview had acquired title to the Madison Street Property until Bayview filed a complaint to quiet title to the property in

November 2010. In the complaint, Bayview stated that in July 2009, Bayview had obtained a tax deed to the Madison Street Property and had recorded it. Bayview alleged that its interest and title to this property was "superior to all persons who have an interest therein," and that the purpose of the action was to "quiet title to the Real Estate as against the world." (App. 2).

Golden Foods filed an answer wherein it alleged that Bayview had represented to Golden Foods that Bayview had redeemed the Madison Street Property and that Bayview had accepted Golden Foods' $1,218.55 monthly payments pursuant to the LAA. Golden Foods also alleged that Bayview had covertly acquired title to the Madison Street Property without notifying Golden Foods. Golden Foods raised the affirmative defenses of actual and constructive fraud, unjust enrichment, and estoppel. Golden Foods also filed a counterclaim alleging that Bayview breached its agreement to redeem the real estate; breached its duties as Golden Foods' agent; committed criminal conversion when it exerted unauthorized control over Golden Foods' funds and rights in the Madison Street Property; and fraudulently procured the tax deed.

In May 2012, Bayview filed a second amended complaint wherein it added Coulter as a defendant and added mortgage foreclosure of both Madison Street and Oliver Street Properties and related claims. The following month, Golden Foods responded as follows:

> 71. [Bayview] converted and exerted unauthorized control over the rights of Golden Foods in the Madison Street Real Estate by

failing to redeem the Madison Street Real Estate and acquiring title for itself.

* * *

73. The Plaintiff has further converted and exercised unauthorized control over the monies paid to [Bayview] by Golden Foods since December 15, 2008.

(App. 103).

In March 2013, Bayview filed a motion for partial summary judgment on the grounds that there were no genuine issues as to any material fact with respect to Bayview's quiet title action and Golden Foods' criminal conversion action. The trial court granted Bayview's motion on the quiet title claim but denied the motion on Golden Foods' conversion claim.

In March 2015, the trial court held a bench trial on the remaining claims, which included Bayview's mortgage foreclosure claim and Golden Foods' conversion claim. Bayview did not call its two senior managers, Halpern and Piedra, to testify. After a trial that included the evidence set forth above, the trial court issued a detailed twenty-seven-page order with 168 findings of fact and conclusions, which provides in relevant part as follows:

Conversion of Madison Street Property

* * *

70. So to summarize the actions of Bayview in connection with the Tax Sale Proceedings:

a. Bayview had breached its undertaking to redeem the Madison Street Property by the redemption deadline, and was faced with the prospect of not only losing its lien, but incurring liability to Golden Foods;

b. Since there was a statutory defect in the tax sale proceedings, both Bayview and Golden Foods had the right to have it set aside;

c. Bayview told Coulter they would look into it, and waive late charges until the matter was resolved;

d. Lueking, as Bayview's counsel, then undertook settlement negotiations;

e. Lueking knew that Golden Foods was a party, and should have been served with documents filed in the Tax Sale Proceeding, but he failed to do so;

f. Although Lueking felt that the interests of Golden Foods and Bayview were initially aligned, he soon determined that they had become adverse when Bayview began contemplating taking title without notice to Golden Foods and Coulter; however, Lueking never advised Coulter or Golden Foods to engage separate counsel;

g. Once the financial terms were established for the settlement with M. Jewell, Lueking and Bayview knew that the settlement structure was up to them and within their control;

h. Lueking knew of settlement structures that were available and would have preserved the mortgagor/mortgagee relationship and the terms in the

proposed LAA; however, these structures were rejected in favor of Bayview acquiring title in its own name;

    i. Bayview took title to the Madison Street Property, without providing Golden Foods with any documentation of the transaction;

    j. Bayview assured Golden Foods that the tax situation had been resolved, but did not discuss that Bayview had taken title; and

    k. This result was in the best interests of Bayview, and contrary to the best interests of its former borrower, Golden Foods.

71. Bayview was acting in a dominant position – from a knowledge, financial strength, and control point of view. This position was exploited for its own benefit.

72. Lueking and Halpern knew or should have known that Bayview had no legal right to take title to the Madison Street Property without notice, and without due process.

73. Bayview actively and purposely concealed the fact that it had taken title to the Madison Street Property from Coulter and Golden Foods. It must be remembered that key decision makers for Bayview – Lueking and Halpern – are attorneys, with expertise in the area of real estate and mortgage lending – and they were fully aware of the nature of the relationship that existed between the parties and the precarious situation created by Bayview's failure to timely redeem the taxes. Although the initial failure to serve Golden Foods in the Tax Sale Proceeding may have been inadvertent, by the time they were making the decision to take title, they were fully aware that Golden Foods had no knowledge of their contemplated actions, and they quite clearly decided to keep it that way.

74. After they had acquired title, Bayview continued to mislead Coulter and Golden Foods. When Gonzalez called Coulter in June after they had signed the settlement agreement, all he said was that the taxes had been taken care of – there was no mention that Bayview had also taken title.

75. Bayview continued to send routine documents to Golden Foods, creating the impression that they had made good on their obligations to redeem the taxes. They sent year end interest and real estate tax statements, and monthly statements. From all appearances, Coulter and Golden Foods had every reason to believe the mortgage and the LAA were in effect. Until, of course, Bayview filed for Quiet Title.

76. Bayview converted the rights of Golden Foods in and to the Madison Street Property. It was in control of the settlement structure. They contemplated a structure that would have maintained title in Golden Foods together with the equity therein. They rejected this structure and instead used a structure to take title for itself.

Statutory Elements of Theft and Conversion

\* \* \*

82. The evidence before the Court establishes that Bayview knowingly or intentionally exercised unauthorized control over Golden Foods' rights and interest in the Madison Street Property by acquiring title for itself without the knowledge or consent of Coulter or Golden Foods when it had the control, the ability, and the duty, on identical financial terms, to structure the M. Jewell settlement so as to preserve the mortgagor/mortgagee relationship under the terms of the LAA.

83. Golden Foods is entitled to recover under the Crime Victim's Recovery Act ("CVRA") an amount not to exceed three (3) times the actual damages suffered, together with the costs of the action and reasonable attorney fees. Ind. Code 34-24-3-1.

* * *

88. [T]he Court . . . adopts a market value for the Madison Street Property at the time of taking by Bayview of $147,500.00.

89. [T]he 'invested' amount of Bayview was the unpaid principal as recited in the LAA of $42,822.77, and the settlement paid to M. Jewell of $32,469.75, for a total of $75,292.52. Accordingly, the value of equity converted by Bayview is $72,207.00, and Golden Foods is entitled to judgment in this amount.

90. Golden Foods is also entitled to recover Enhanced Damages under the CVRA in the amount of $50,000.

Merger and Extinguishment of Note and Mortgage

91. Bayview has continued to pursue its original claim to Quiet Title, and a partial summary judgment of Quiet Title has been entered in favor of Bayview.

92. Bayview nonetheless seeks foreclosure of the mortgage on the Madison Street Property and the mortgage on the Oliver Street Property, and judgments on the Note and Guaranty for any deficiency.

93. All of these requests are contrary to the understanding of Halpern and Lueking, attorneys sophisticated in real estate lending law, that the Tax Title Deed was being treated as a deed of lieu of foreclosure with no intended residual financial obligation on the part of Coulter or Golden Foods.

94. Notwithstanding, Bayview claims that it was not their intent for there to be a merger of the mortgage and indebtedness into the Tax Title Deed. There is no credible evidence to support this.

* * *

97. Here, there is abundant, compelling evidence that this is exactly what Bayview intended to accomplish – acquire title as a deed in lieu of foreclosure, with no residual financial obligation

for Golden Foods, and secure its right, title and interest as superior to all persons, including Coulter and Golden Foods.

98. There is simply no evidence to support the anti-merger contention of Bayview. The only evidence before the Court is that Bayveiw was acting and intended to act as the title owner, not mortgagee, by taking the Tax Deed as similar to a deed in lieu of foreclosure, and not requiring any additional documentation to preserve a future claim for residual liability against Golden Foods and Coulter.

99. This intent is further established by Bayview securing possession of the property and changing locks, and asserting since the date that the Tax Deed was issued that Bayview's right, title, and interests in the Madison Street Property were superior to all other persons, including Golden Foods and Coulter. . . . Bayview's consistent claim that its right, title and interest is superior to any interest of Golden Foods is inherently inconsistent with the "anti-merger" argument of Bayview that the mortgagor/mortgagee relationship was presented such that Golden Foods held title, and Bayview held only a lien.

100. Bayview also acted as owner, not mortgagee, after it acquired title. On August 21, 2009, Gonzalez issued orders to "SECURE THE ABOVE PROPERTY, CHANGE LOCKS AND WINTERIZE." Trial Ex. 17 BLS-36. . . . There is no indication that anyone at Bayview first attempted to contact Golden Foods, a necessary predicate to entering upon the premises if Bayview was acting under the terms of the mortgage as it now claims. . . .

\*     \*     \*

105. Without so much as an advance telephone call to Coulter, Bayview then filed this Quiet Title action on November 29, 2010. It did not sue as mortgagee.

106. Bayview initiated this action in a single count as a "MI" action (and not "MF") to Quiet Title to the Madison Street

Property in November 2010. Lueking claims that he did not also sue on the Note and LAA to keep the case "simple."

107. Lueking also expected that, if Bayview prevailed in its quiet title action, Bayview would have sold the property as an REO property, "they would have the money," and then "closed the file." Tr. 559-60. This of course is the same result as taking the property by way of a deed in lieu of foreclosure.

108. The court finds and concludes that the 1988 mortgage and note were merged into the Tax Deed as a matter of law.

109. This further discharged Coulter as guarantor, and discharged the purported Oliver Street Mortgage.

110. Bayview would not be entitled to foreclose on the Oliver Street Mortgage in any event. Said mortgage was improperly executed, and was not signed by Coulter as Mortgagor and owner of the property – rather, Golden Foods signed in such capacity and it did not hold title to the property.

### Conversion of Coulter's Funds

\* \* \*

112. [I]t appeared to Coulter and Golden Foods that Bayview had made good on its promise to "take care of the situation," and once notified in June 2009, that it had been resolved, began making monthly payments in the amount of $1,218.55. Golden Foods made ten payments that were accepted by Bayview in 2009 and 2010. . . .

113. Despite the fact that Bayview considered that it had acquired title as comparable to a deed in lieu, secured possession of the property, failed to sign the Loan Adjustment Agreement, and otherwise acted as owner of the property, it continued to send documents to Golden Foods as if the Loan Adjustment Agreement had been executed and Golden Foods was still the title holder. To the extent Golden Foods was willing to make

monthly payments, ignorant of the fact that the Loan Adjustment Agreement had never been signed, Bayview profited and was not at risk as it held title to the property.

114. The passage of time was also beneficial to Bayview. Lueking knew Golden Foods' appeal rights were limited to 60 days from issuance of the Tax Deed, but that it could be extended up to 2 years if "due process" implications were involved. Tr. 557.

115. As shown above, the Note and Mortgage were merged and extinguished by the acts of Bayview, and the LAA was never in effect and was never even signed by Bayview. (Trial Ex. 72, Request for Admission No. 3, admits that never signed) By nonetheless sending monthly notices, Bayview was inducing Coulter to make payments under false pretenses.

116. Bayview exerted unauthorized control over Coulter's funds through false pretenses.

117. Coulter is entitled to judgment against Bayview for the funds converted, $12,185.50.

118. Under the CVRA, Coulter is also entitled to recover costs and attorney fees.

119. Coulter is also entitled to recover enhanced damages under the CVRA in the amount of $24,000.00.

Failure to Call Halpern and Piedra

120. As noted above, the only two (2) senior officers of Bayview that were involved from the time Bayview decided to take title and up until it filed suit to quiet title were Piedra and Halpern.

121. Snyder was not involved until asked to sign affidavits in this litigation. Bayview deliberately chose to rely on a witness with no personal knowledge of the events leading up [to] this litigation.

122. Piedra and Halpern were the only senior officers with personal knowledge of the decisions that were made on behalf of Bayview but were not called, even though they are still employed by Bayview.

123. *If such was the case,* these officers could have been called to testify that they did not intend for the Tax Deed to constitute a deed in lieu of foreclosure, and that they intended that the Note, Mortgage, and unsigned LAA to be the governing documents between the parties. They were not called to so testify. *No one with personal knowledge of Bayview's intent testified that there were any funds due to Bayview from Golden Foods.*

\* \* \*

127. The failure to call Halpern and/or Piedra raises an inference that their testimony would have been adverse to the positions asserted by Bayview herein.

\* \* \*

Judgment

It is Therefore Ordered, Adjudged and Decreed that judgment is entered in favor of Golden Foods and against Bayview on Golden Foods' claim that Bayview converted the rights and interest of Golden Foods in the Madison Street Property, and Golden Foods shall have and recover against Bayview a judgment in the amount of $72,207.00 in compensatory damages, and $50.000.00 in additional damages under Ind. Code 34-24-3-1.

It is Further Ordered, Adjudged and Decreed that judgment is entered in favor of Coulter and against Bayview on Coulter's claim that Bayview converted the monthly payments made by him, and Coulter shall have and recover against Bayview judgment in the amount of $12,185.50 in compensatory damages, and $24,000 in additional damages under Ind. Code 34-24-3-1.

*     *     *

> It is Further Ordered, Adjudged and Decreed that judgment is entered against Bayview and in favor of Golden Foods on all other claims of Bayview, and Bayview is Ordered to execute a Release of the Oliver Street Mortgage within thirty (30) days of the date hereof.

(App. 57-84). Bayview now appeals.

# Decision

[20] Bayview appeals the judgment in favor of Golden Foods and argues that: (1) the trial court's judgment in favor of Golden Foods on Bayview's mortgage foreclosure claim is contrary to law; and (2) the trial court's judgment that Bayview converted Golden Foods' rights and interest in the Madison Street Property and Coulter's monthly payments on the LAA is clearly erroneous. We address each of its contentions in turn.

[21] The trial court entered findings of fact and conclusions thereon at Bayview's request. In reviewing findings of fact and conclusions of law, we apply a two-tiered standard of review by first determining whether the evidence supports the findings and then whether the findings support the judgment. *Weigel v. Weigel*, 24 N.E.3d 1007, 1010 (Ind. Ct. App. 2015), *reh'g denied*. The trial court's findings and judgment will be set aside only if they are clearly erroneous. *Barton v. Barton*, 47 N.E.3d 368, 373 (Ind. Ct. App. 2015), *trans. denied*; *see also* Ind. Trial Rule 52(A) ("[T]he court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

Findings are clearly erroneous when the record contains no facts to support them either directly or by inference. *Campbell v. Campbell*, 993 N.E.2d 2d 205, 209 (Ind. Ct. App. 2013), *trans. denied*. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.*

## 1. Mortgage Foreclosure

[22] At the outset, we note that Bayview, the party with the burden of proof on the mortgage foreclosure claim, is appealing from a negative judgment on this issue and will prevail only if it establishes that the judgment is contrary to law. *See Helmuth v. Distance Learning Sys. Ind. Inc.,* 837 N.E.2d 1085, 1089 (Ind. Ct. App. 2005). A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead only to one conclusion but the trial court reached a different conclusion. *Id.*

[23] The first issue is whether the trial court's judgment in favor of Golden Foods on Bayview's mortgage foreclosure claim is contrary to law. A typical real estate mortgage transaction includes two entities: (1) the mortgagee, which is typically a bank or mortgage company that holds the mortgage which serves as a lien on the property; and (2) the mortgagor, which is typically the homeowner who holds the legal title with the right of redemption. *Citizens State Bank of New Castle v. Countryside Home Loans, Inc.,* 949 N.E.2d 1195, 1197 (Ind. 2011). When one of the entities acquires both the mortgage lien and the legal title to the property, the two interests are said to merge. *Id.* Specifically, the mortgage

merges with the legal title, and the mortgage lien is thereby extinguished. *Id.* The key factor in deciding whether merger has occurred is determining what the parties, primarily the mortgagee, intended. *Deutsche Bank Nat'l Trust Co. v. Mark Dill Plumbing Co.,* 908 N.E.2d 1273, 1274 (Ind. Ct. App. 2009).[8]

[24] Bayview argues that the trial court erred in "denying [its] mortgage foreclosure action." (Bayview's Br. 40). Specifically, Bayview argues that it "did not intend to merge the Madison Street Mortgage into its tax deed, so the trial court's merger finding is clearly erroneous and legal error." (Bayview's Br. 40). Golden Foods responds that, "[t]here is overwhelming evidence that, just as the trial court found . . . , Bayview clearly intended to take title and extinguish the underlying mortgage and note when it surreptitiously acquired title." (Golden Foods' Br. 17).

[25] Our review of the evidence reveals that after rejecting an alternative that would have returned Bayview and Golden Foods to the relationship contemplated by the LAA, Bayview sent a revised settlement agreement to Jewell in May 2009. In an accompanying email, Leuking explained to Jewell's attorney that, from Bayview's perspective, the transaction was similar to a deed in lieu of

---

[8] Merger will not occur, however, and the lien will be preserved, where merger would harm the interests of the mortgagee. The underlying purpose of this anti-merger rule is to protect the mortgagee's priority. *Id.* Specifically, the rule guarantees the mortgagee's priority in any proceeds. *Id.* Therefore, where there are no junior lienholders, the anti-merger doctrine does not apply. *American Family Mut. Ins. Co. v. Welton*, 926 F.Supp. 811, 817 (S.D. Ind. 1996) (applying Indiana law). Because there are no junior lienholders in this case, the anti-merger rule does not apply.

foreclosure, where the property owner gives the property deed to the lender and the lender agrees not to initiate foreclosure proceedings. Both Leuking and a Bayview Vice President knew that the settlement agreement would extinguish Golden Foods' underlying debt unless the parties contemporaneously executed documentation to establish a residual financial obligation on the borrower. However, no such documentation was ever prepared or submitted to Golden Foods. The month after the tax deed was issued to Bayview, Gonzalez issued an order to secure the Madison Street Property, which included changing the locks and winterizing the pipes. One year later, Bayview filed a complaint to quiet title to the property wherein it alleged that its interest and title to the property was superior to all, including Golden Foods and Coulter.

[26] This evidence supports the trial court's conclusion that Bayview intended to acquire title to the Madison Street Property as a deed in lieu of foreclosure with no residual obligation for Golden Foods. The evidence further supports the trial court's conclusion that the Madison Street Mortgage merged into the tax deed. The trial court's judgment is not contrary to law.[9]

---

[9] Bayview raises three additional arguments related to the merger issue. Specifically, Bayview first argues that the trial court erred in finding that Bayview's failure to call Halpern and/or Piedra as witnesses at trial raised an inference that their testimony would have been adverse to Bayview's position at trial. However, we need not address whether this finding is erroneous because we have held that "even an erroneous finding is not fatal to the trial court's judgment if the remaining valid findings and conclusions support the judgment, rendering the erroneous finding superfluous and harmless as a matter of law." *Curley v. Lake Cnty. Bd. of Elections and Registration*, 896 N.E.2d 24, 32 (Ind. Ct. App. 2008). Here, several of the trial court's

## 2. Conversion

[27] Bayview further argues that there is insufficient evidence to support the trial court's conclusion that Bayview committed criminal conversion. Bayview's argument is two-fold. Bayview first contends that "the trial court erred by applying a tort instead of a contract standard." (Bayview's Br. iii). Bayview further contends that even if tort law applies, there is insufficient evidence to support the trial court's conclusion that it committed criminal conversion. We address each of Bayview's contentions in turn.

[28] Bayview first argues that Golden Foods is attempting to "'up the ante' by repackaging their breach of contract claim as one for criminal conversion." (Bayview's Br. 13). Bayview is correct that "a party may not restyle a breach-of-contract claim as a tort simply to obtain additional damages." *French-Tex*

---

remaining and uncontested conclusions independently support its judgment that the trial court did not err in ruling against Bayview on its mortgage foreclosure action.

Bayview also argues that the trial court "committed legal error in finding Bayview's Oliver Drive Mortgage [was] invalid due to a Scrivener's Error." (Bayview's Br. 50). Again, we need not address whether this finding is erroneous because the trial court's alternative finding that the merger of the mortgage and tax deed discharged the Oliver Street Mortgage, which Bayview does not contest, supports the demise of this mortgage. *See id.*

Lastly, Bayview argues that the trial court erred in finding that none of the witnesses had personal knowledge of the amount due on the Madison Street Mortgage. Golden Foods responds that this was not a trial court finding. Rather, according to Golden Foods, the trial court found that no one with knowledge of Bayview's *intent* testified that there were any funds due to Bayview from Golden Foods. We agree with Golden Foods and further conclude that even if the trial court had made such a finding, such information is irrelevant where Bayview does not challenge the amount of damages.

*Cleaners, Inc. v. Cafaro Co.,* 893 N.E.2d 1156, 1167 (Ind. Ct. App. 2008). Tort law should not interfere where the source of a party's duty to another arises from a contract. *JPMCC 2006-CIBC14 Eads Parkway LLC v. DBL Axel, LLC,* 977 N.E.2d 354, 364 (Ind. Ct. App. 2012), *reh'g denied, trans. denied.* The Indiana Legislature did not intend to criminalize bona fide contract disputes. *Id.* For example in *French-Tex*, a tenant alleged that its landlord had committed conversion by overcharging the tenant for its share of real estate taxes due under the lease. The trial court concluded, and this Court agreed, that the tenant's claim constituted a bona fide contract dispute and not a claim for conversion. *French-Tex*, 893 N.E.2d at 1166-67.

[29]     However, to the extent that a plaintiff's interests have been invaded beyond mere failure to fulfill contractual obligations, a tort remedy should be available. *Greg Allen Const. Co. v. Estelle*, 798 N.E.2d 171, 173 (Ind. 2003), *reh'g denied.* For example, in *Auto Liquidation Center, Inc. v. Chaca*, 47 N.E.3d 650 (Ind. Ct. App. 2015), the Center repossessed Chaca's car because it erroneously believed that Chaca had missed a payment. Only after the Center learned that Chaca was current on his payments, did it claim to have repossessed the car because Chaca had disconnected the vehicle's GPS devices, which the Center had installed. After learning that the GPS was disconnected because it was damaging the car and that Chaca's mechanic would re-install it, the Center refused to give Chaca either the car or his belongings. Based on these facts, this Court concluded that there was evidence that the "misunderstanding morphed into an intentional

unauthorized taking of [Chaca's] property." *Id.* at 655. We therefore affirmed the criminal conversion verdict against the Center. *Id.*

[30] Here, Bayview and Golden Foods entered into a contractual relationship in 2005 when mortgages were assigned to Bayview. After Golden Foods became delinquent on the Madison Street Property's taxes, the property was purchased by Jewell at a tax sale. Bayview told Golden Foods it would redeem the property and subsequently discussed, drafted, and sent an LAA to Golden Foods. Although Golden Foods signed the LAA, Bayview never did. Then, when Bayview failed to timely redeem the property, and Jewell was issued the tax deed, Bayview entered into negotiations with Jewell regarding the property. Golden Foods was not a party to the negotiation or the settlement. Eventually, Bayview took title to the property without telling Golden Foods. Although Bayview had title to the property and had never signed the LAA, Bayview then accepted ten LAA payments from Golden Foods. This evidence reveals that Bayview went beyond merely failing to fulfill its contractual obligation, and that a tort remedy should be available. Stated differently, as in *Chaca,* the contractual relationship between Bayview and Golden Foods morphed into a tort.

[31] Having concluded that tort law applies in this case, we now turn to Bayview's argument that there is insufficient evidence to support the trial court's conclusion that it committed criminal conversion. INDIANA CODE § 35-43-4-3 provides that a "person who knowingly or intentionally exerts unauthorized

control over the property of another commits criminal conversion." A person engages in conduct intentionally if, when he engages in the conduct, it is his conscious objective to do so. IND. CODE § 35-41-2-2. A person engages in conduct knowingly if, when he engages in the conduct, he is aware of a high probability that he is doing so. *Id.* Exerting control over property means to obtain, take, or possess property. IND. CODE § 35-42-4-1. Control is "unauthorized" if it is exerted without the other person's consent, in a manner or to an extent other than to which the other party has consented, or by creating or confirming a false impression in the other person. I. C. § 35-43-4-1.

[32] A person who suffers a pecuniary loss as the result of a conversion pursuant to INDIANA CODE § 35-43-4-3 is entitled to bring a civil action under the Crime Victims Relief Act ("CVRA") for damages in an amount not to exceed three times his actual damages, plus costs and attorney fees. I.C. § 34-24-3-1. The claimant need only prove the elements of the criminal conduct by a preponderance of the evidence. *Wysocki v. Johnson*, 18 N.E.3d 600, 606 (Ind. 2014). Where a defendant's conduct may constitute an intentional tort as well as lead to liability under the CVRA, the plaintiff is free to "place all [his] eggs in the CVRA basket and take [his] chances on the fact-finders' assessment of criminality in exchange for the assurance of recovering costs and attorney fees if [he] prevail[s]." *Id.* at 605-06.[10]

---

[10] This is what Golden Foods did in this case. Before trial, Golden Foods and Coulter withdrew the punitive damages claim and explained that they intended to pursue their right of recovery solely under the CVRA.

[33] Bayview contends that that there is insufficient evidence that it committed criminal conversion of either the Madison Street Property or Golden Foods' LAA payments. Golden Foods and Coulter respond that the "evidence is overwhelming that Bayview knowingly and intentionally embarked upon a calculated course of conduct to surreptitiously take Golden Foods' Madison Street Property for its own use and benefit, and then purposely create[] a false impression in Coulter and Golden Foods that the relationship contemplated by the LAA was in place in order to induce them to make monthly payments." (Golden Foods' Br. 27). According to Golden Foods, Bayview's actions constitute conversion. We agree with Golden Foods.

[34] Our review of the evidence reveals that after Jewell acquired the tax deed to the property, Bayview structured a deal to acquire the property and change Bayview's status from mortgage lienholder to fee simple owner. Specifically, Leuking drafted a settlement agreement, which Piedra authorized, that passed the tax deed directly to Bayview. Four days later, Gonzalez told Coulter that the Madison Street Property taxes had been paid but failed to mention that Bayview had taken title to the property. In the meantime, Coulter, who believed that Bayview had settled the situation with Jewell and that the LAA was in effect, began making the $1,218.55 monthly payment to Bayview. Although Bayview now held title to the property and had never signed the LAA, Bayview accepted Coulter's payments for ten months until it filed a complaint to quiet title to the property. This evidence supports the trial court's

conclusion that Bayview converted the Madison Street Property as well as Coulter's LAA payments. The trial court's judgment is not clearly erroneous.[11]

[35] Affirmed.

[36] Baker, J., and Bradford, J., concur.

---

[11] Bayview also argues that because it did not commit criminal conversion, application of the Indiana [CVRA] is improper. Having concluded that there is sufficient evidence to support the trial court's conclusion that Bayview committed criminal conversion, we need not address this issue. We further note that Bayview does not challenge the amount of damages awarded pursuant to this statute.

Bayview raises two additional arguments that are related to the conversion issue. Specifically, Bayview first argues that the "trial court's finding that Golden Foods was not guilty of unclean hands is clearly erroneous." (Bayview's Br. 25). Specifically, Bayview alleges that Golden Foods had unclean hands because Coulter misrepresented his income in his hardship letter to Bayview. The unclean hands doctrine is an equitable tenet that demands one who seeks equitable relief to be free of wrong doing in the matter before the court. *Ruder v. Ohio Valley Wholesale, Inc.,* 736 N.E.2d 776, 780 (Ind. Ct. App. 2000). In addition, the alleged wrongdoing must have an immediate and necessary relation to the matter being litigated. *Id.* The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his misconduct. *Id.* at 781. Here, because Golden Foods was not seeking equitable relief, the unclean hands doctrine does not apply. Further, Coulter's alleged misrepresentation regarding his income had no immediate and necessary relation to whether: (1) the mortgage and tax deed merged; or (2) Bayview committed criminal conversion. The unclean hands doctrine simply does not apply in this case, and the trial court's finding in this regard is not clearly erroneous.

Bayview also argues that the trial court erred in calculating Golden Foods' equity in the Madison Street Property. Specifically, Bayview contends that the trial court "failed to take into account the outstanding interest due Bayview at the time of the LAA as well as the real estate taxes for 2008, payable in 2009." (Bayview's Br. 33-34). The total reduction sought by Bayview was $9,545.60, which included $7,200.90 in real estate taxes and $2,344.79 in interest and other fees. Bayview, however, has waived appellate review of this issue because it failed to raise it at trial. S*ee McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003) (explaining that an issue raised for the first time on appeal is waived). Wavier notwithstanding, we note that Leuking testified at trial that Delaware County had "agreed to go ahead and waive the 2008 [taxes] payable in 2009." (Tr. 503). We find no error here.