

FILED

Sep 27 2023, 9:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Casandra J. Nelson
Law Office of Casandra J. Nelson, LLC
Noblesville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of Z.H. (Minor Child Alleged to be a Child in Need of Services);

Hamilton County GAL/CASA Program,

*Appellant,*

v.

Indiana Department of Child Services,

*Appellee.*

September 27, 2023

Court of Appeals Case No. 23A-JC-1120

Appeal from the Hamilton Circuit Court

The Honorable Valorie S. Hahn, Magistrate

Trial Court Cause No. 29C01-2208-JC-1085

**Opinion by Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Judge.**

## Case Summary

If the Department of Child Services ("DCS") and the trial court do not act in the child's best interests, who will? In this case, we reiterate the fundamental purpose behind the statutes governing children in need of services ("CHINS") cases—the protection of children—and we highlight the crucial role guardians ad litem and court appointed special advocates play in advocating for the children's best interests. That role comes into sharper focus here, where it is apparent that the Department of Child Services ("DCS") and the trial court inexplicably ignored the best interests of the child.

DCS filed a petition that alleged Z.H., X.H., Lm.H., and J.H. (collectively, the "Children") were CHINS as to Le.H. ("Mother") and J.G. ("Father").[1] The trial court adjudicated the Children CHINS as to Father; however, before the trial court held a fact-finding hearing regarding the same allegations against Mother, DCS moved to dismiss the CHINS cases. The guardian ad litem ("GAL") objected to the dismissal of Z.H.'s CHINS case. Nonetheless, the trial court dismissed the CHINS cases, including Z.H.'s, because the Children had not yet been adjudicated CHINS as to Mother.

Z.H. was left in the care of her twenty-one-year-old sister, V.H. ("Sister"), without the establishment of a guardianship. Legal custody remained with Mother, who is alleged to have repeatedly abused Z.H. and faces criminal

---

[1] Father and Mother do not participate in this appeal.

charges therefor. On behalf of Z.H., the GAL appeals and argues that the trial court erred by dismissing Z.H.'s CHINS case. We agree and, accordingly, reverse and remand.

## Issue

The parties raise several issues, but we find one issue dispositive: whether the trial court erred by dismissing Z.H.'s CHINS case.

## Facts

Z.H. was born in 2009. She has three younger siblings. X.H. was born in 2012, Lm.H. was born in 2014, and J.H. was born in 2015. The Children also have an adult sister, Sister, who was twenty-one years old at the time of the relevant proceedings and who lives separately from the rest of the family. Father is not active in the Children's lives.

On August 1, 2022, DCS filed a petition that alleged the Children were CHINS due to neglect and physical abuse. DCS alleged the following: in July 2022, the Children and Mother were living in a hotel while fire damage to their house was being repaired. On July 13, 2022, the Children ran away from Mother and contacted Sister, who picked them up. The Children ran away because Mother's boyfriend "hits/whips them with cords, and [Mother] also hits them." Appellant's App. Vol. II p. 15. Mother had "punched [Z.H.] in the back of the head" that night, and Mother's boyfriend hit the Children the previous day. *Id*. The Children all had documented bruises.

[7] Family Case Manager ("FCM") Azalea Settles-Wilkinson went to the hotel to speak with Mother and the Children on several occasions. On the second occasion, she observed that Z.H. had "busted blood vessels in her right eye." *Id*. at 16. DCS alleged that Mother had been upset that Z.H. was using the computer and that Mother struck Z.H. in the face with the computer. Mother then destroyed the computer so that it was "no longer a problem." *Id*. A Pediatric Evaluation and Diagnostic Service examination revealed that Z.H.'s injury was consistent with her being struck in the face; however, Mother denied striking Z.H. During FCM Settles-Wilkinson's conversation with Mother, Mother was on her computer and "not engaged in the conversation . . . ." *Id*. at 17. Z.H. has a history of running away and of being inappropriately touched by family members, and she was receiving therapy.

[8] DCS spoke with Sister, who reported that this was not the first time she picked the Children up after they ran away from Mother and that physical abuse was "an on-going issue in the home." *Id*. at 16. She reported that Mother "knows how to play the system because the family has been involved with [child services departments] for their entire lives" and that "Mother will not change and the children [will] continue to be physically abused." *Id*. at 19. Mother has a substantiated report of physical abuse of the Children from 2020 and a substantiated report of neglect of the Children from 2021. Mother also has substantiated reports of the Children being removed from her care in Georgia.

[9] DCS alleged that the Children were CHINS as to Mother and Father; however, DCS was unable to locate Father. Additionally, based on the allegations

against Mother, the State charged Mother with domestic battery against a person who is under the age of fourteen, a Level 6 felony, in Cause No. 29D03-2211-F6-007699.[2]

[10] The trial court held an initial hearing on the CHINS petition on August 8, 2022, where Mother denied the allegations, and Father failed to appear. The trial court ordered the Children placed with L.M. ("Maternal Grandmother"). Later that month, the trial court approved the appointment of the GAL.

[11] After several continuances, on September 23, 2022, DCS moved for a fact-finding hearing as to "Father only," whom DCS had still been unable to locate. *Id*. at 57. The trial court held that hearing on November 28, 2022, and adjudicated the Children CHINS as to Father after Father failed to appear. DCS did not request a fact-finding hearing as to Mother until December 1, 2022, and the trial court scheduled that hearing for February 6, 2023.

[12] On December 16, 2022, the GAL filed a report with the trial court. The GAL reported that the Children were doing well with Maternal Grandmother and were receiving therapy through their school. The GAL further reported that DCS made a referral for "[Z.H.] and Mother to start therapy together to build their communication and relationship prior to the children returning to Mother's home" and that "[t]he plan is to move toward unsupervised visits after

---

[2] This case was pending at the time of this appeal.

Mother demonstrates continued compliance with her DCS case plan." *Id*. at 81, 84. Meanwhile, the supervised visits with Mother were also going well.

[13] On January 14, 2023, however, the GAL attended Mother's supervised visit at Maternal Grandmother's house, and although X.H., J.H., and Lm.H. engaged with Mother, Z.H. "would not come out of her room." *Id*. at 100. Maternal Grandmother reported to the GAL that Z.H. "withdraws when Mother is around." *Id*.

[14] On January 26, 2023, the trial court awarded unsupervised visits to Mother. Meanwhile, DCS moved to continue Mother's February 6, 2023 fact-finding hearing to have "more time to work on a resolution that [would] not require the Court's intervention." *Id*. at 90. The trial court granted the motion and continued the hearing to May 15, 2023.

[15] In February 2023, Maternal Grandmother was experiencing "a family emergency with her extended family" and requested that the Children be placed back with Mother. *Id*. at 97. The GAL did not agree with this plan unless there were "firm safety measures agreed upon and monitored." *Id*. at 101. DCS presented Mother with a safety plan that required Mother to "use proper discipline," "not have other adults living in the home," and "ensure [Z.H.] is receiving services to address mental health concerns." *Id*. The GAL was not informed regarding whether Mother agreed to the safety plan. Nonetheless, according to the GAL, on February 18, 2023, the Children were placed back with Mother, who had moved back into her house.

[16] DCS's account is somewhat different than the GAL's. On February 20, 2023, DCS moved the trial court to approve a trial home visit and alleged that the Children had been placed in "foster care" and that Mother had "made progress in this case and [was] in compliance with the case plan." *Id*. at 93. The trial court approved the trial home visit.

[17] According to the GAL, on March 5, 2023, Z.H. did not follow Mother's "bedtime rules," and Mother "got a belt and spanked [Z.H.] with it." *Id*. at 98. Z.H. reported that Mother also "choked her with two hands." *Id*. Z.H. then went to lay in her bed, but Mother "stated [Z.H.] could not lay on the bed because [Mother] paid for the bed, and, if [Z.H.] was not going to behave, [Z.H.] would need to sleep on the floor." *Id*. Z.H. laid on the floor, and Mother continued to hit her. Z.H. ran away later that night, and Mother drove around looking for her. When Mother found Z.H., Mother "drove her car up onto the sidewalk and nudged [Z.H.] with the car." *Id*. at 99. Maternal Grandmother picked up Z.H. for the night.

[18] Z.H. ended up staying with Sister. Mother "refused to provide any of [Z.H.]'s clothing, book bag, or personal items for her care." *Id*. at 101. Mother stated that Mother "paid for the items, so she would be keeping them." *Id*. Mother eventually provided some of Z.H.'s belongings to Sister; however, some "had been cut with scissors or a knife." *Id*. Z.H. witnessed Mother "slice her backpack strap with a knife." *Id*.

[19]     Z.H. later told the GAL, "Why do you all keep giving me back to [Mother]? She doesn't want me, and she's abusive." *Id.* at 99. Z.H. indicated that she does not "feel safe" with Mother. *Id.* When the GAL told Mother that spanking Z.H. with a belt was inappropriate discipline, Mother responded, "I thought I just couldn't touch her with my hands." *Id.* at 98. Z.H. is struggling in school and has been evaluated for concerns of self-harm.

[20]     On April 4, 2023, DCS informed the GAL that DCS would be "recommending case closure as Mother has completed all of the services requested."[3] *Id.* at 103. DCS's plan was to leave Z.H. with Sister under an "informal arrangement" with Mother and leave the three other children with Mother. *Id.* The GAL expressed concern regarding the informal nature of the arrangement because it would "leave all of the care to [Sister], but none of the authority[] for schooling, health care, or financial support." *Id.* The GAL recommended that services continue for the Children.

[21]     On April 14, 2023, DCS filed a motion to dismiss the CHINS cases against Mother. DCS argued that "[t]he circumstances that initially resulted in the filing of the petition alleging the children are children in need of services have substantially changed and there is no longer a legally sufficient basis to proceed under this cause." *Id.* at 105. The GAL objected to the motion. At the time,

---

[3] The record is silent regarding whether DCS followed through on the referral for joint therapy between Mother and Z.H.

the trial court had not yet held the fact-finding hearing regarding the CHINS petition with respect to Mother.

[22] The trial court held a hearing on the motion to dismiss on April 17, 2023. The GAL explained that she only objected to the dismissal of Z.H.'s CHINS case; the trial court summarily dismissed the CHINS cases regarding the other children.

[23] DCS argued that Z.H.'s CHINS case should also be dismissed because Z.H. was living with Sister and DCS did not see any issues with the "care or well-being of [Z.H.] in this placement." Tr. Vol. II p. 5. DCS also explained that DCS was not currently providing services to Z.H. because Z.H. was already receiving therapy through her school, which would continue even if the CHINS case was closed.

[24] The GAL argued that Z.H.'s CHINS case should not be dismissed because: (1) Z.H. and Sister might be called to testify in Mother's pending criminal trial for domestic battery; (2) ongoing issues remained between Mother and Z.H., including the March 5, 2023 incident; (3) "permanency had not yet been established" because Z.H. was living with Sister, who was not Z.H.'s legal guardian, and Mother indicated that she would not agree to a guardianship; (4) Mother refused to sign a safety plan; and (5) Mother communicates with Z.H. and Sister through Maternal Grandmother rather than with Z.H. and Sister directly. *Id.* at 10.

The trial court stated:

> I think there's a lot more [DCS] could do for [Z.H.]. I think that
> [Z.H.] doesn't have a legal guardian. She's staying at [Sister's]
> house[,] and there was just an incident in March where she
> alleges that she was bumped by her mom's car as well as choked
> in another domestic violence incident. So I think that there are
> services that could be provided to her, but I'm also sitting here
> and we're pre-fact-finding as to Mom. . . .

*Id.* at 11. The trial court took the matter under advisement. On April 19, 2023,
the trial court dismissed Z.H.'s CHINS case. The order stated:

> The Motion to Dismiss is GRANTED and the child in need of
> services cause is DISMISSED WITHOUT PREJUDICE over
> the objection of the GAL. There has not been an adjudication as
> to Mother in this cause.

Appellant's App. Vol. II p. 110. The GAL now appeals.

## Discussion and Decision

The GAL argues that the trial court erred by dismissing Z.H.'s CHINS case.
The GAL contends that the trial court determined that dismissal was
mandatory solely because Z.H. had not yet been adjudicated a CHINS as to
Mother. Based on the record before us, this appears to be the trial court's

reason for dismissing Z.H.'s CHINS case, and we find that this reason is erroneous.[4]

[27]    This case largely turns on Indiana Code Section 31-34-9-8 (the "dismissal statute"), upon which this Court has had little occasion to opine. That statute provides:

> (a) A person representing the interests of the state may file a motion to dismiss any petition that the person has filed under this chapter.
>
> (b) If a person files a motion to dismiss under subsection (a), the person must provide to the court a statement that sets forth the reasons the person is requesting that the petition be dismissed.
>
> (c) Not later than ten (10) days after the motion to dismiss is filed under subsection (a), the court shall:
>
>> (1) summarily grant the motion to dismiss; or
>>
>> (2) set a date for a hearing on the motion to dismiss.
>
> (d) If the court sets a hearing on the motion to dismiss under subsection (c)(2), the court may appoint:
>
>> (1) a guardian ad litem;

---

[4] The GAL also argues: 1) even if Z.H. had not yet been adjudicated a CHINS as to Mother, Z.H. had been adjudicated a CHINS as to Father; and 2) the GAL is entitled to prosecute Z.H.'s CHINS case in lieu of DCS. Based on our determination that the trial court erred by dismissing Z.H.'s CHINS case, we do not address these arguments.

> (2) a court appointed special advocate; or
>
> (3) both a guardian ad litem and a court appointed special advocate;

to represent and protect the best interests of the child.

[28] "When interpreting a statute, we begin by reading its words in their plain and ordinary meaning, taking into account 'the structure of the statute as a whole.'" *Town of Linden v. Birge*, 204 N.E.3d 229, 237 (Ind. 2023) (quoting *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016)). We presume that the "'legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals.'" *Id.* (quoting *Rodriguez v. State*, 129 N.E.3d 789, 793 (Ind. 2019)). "Ultimately, 'our goal is to determine and give effect to' the legislature's intent." *Id.* (quoting *State v. Int'l Bus. Machines Corp.*, 964 N.E.2d 206, 209 (Ind. 2012)). In discerning the legislative intent of a statute, we may consider the statute's history, including amendments to its pertinent language. *See, e.g.*, *Pabey v. Pastrick*, 816 N.E.2d 1138, 1152 (Ind. 2004).

[29] Here, subsection (b) of the dismissal statute requires the person seeking to dismiss the petition to "set[] forth the reasons" that the petition should be dismissed. Ind. Code § 31-34-9-8(b). Meanwhile, subsection (c) of the statute gives the trial court the option to either "summarily grant" the motion to dismiss or "set a date for a hearing" on said motion. *Id.* § 31-34-9-8(c). If the trial court elects to hold a hearing, the statute permits the court to appoint a

guardian ad litem, court appointed special advocate, or both "to represent and protect the best interests of the child." *Id*. § 31-34-9-8(d).

[30] A plain reading of the statute reveals that the Indiana General Assembly did not intend for the filing of a motion to dismiss to mandate dismissal of a CHINS case. Rather, the General Assembly intended for trial courts to review the reasons proffered in support of dismissal in light of the evidence and allegations and then determine whether dismissal is in the child's best interests. In other words, the decision regarding whether to dismiss the CHINS case rests in the trial court's sound discretion.

[31] The history of the dismissal statute confirms our interpretation. A prior version of the dismissal statute read, "Upon motion by the person representing the interests of the state, the juvenile court **shall** dismiss any petition the person has filed." Pub. L. No. 1-1997 (codified at Ind. Code § 31-34-9-8) (1997) (emphasis added). In *In re K.B.*, 793 N.E.2d 1191, 1197 (Ind. Ct. App. 2003), a panel of this Court interpreted this former statute to require dismissal of the CHINS case upon motion by a person representing the interests of the State, but only when that motion was filed within "a time contemporaneous with that person's filing of the CHINS petition." The Court ultimately held that, because the mother in *K.B.* had already admitted to the allegations contained in the CHINS petition by the time the agency moved for dismissal, the agency's right to mandatory dismissal had expired. *Id*. at 1198. In other cases, however, so long as the proper party filed a motion to dismiss before the CHINS adjudication, the statute appeared to require dismissal.

[32] Then, in 2005, the General Assembly amended the dismissal statute to reflect its current language. In so doing, the General Assembly removed the "shall dismiss" language and replaced it with the procedures described above. We cannot read the current version of the dismissal statute to still require dismissal upon the filing of a motion to dismiss in light of the General Assembly's deliberate choice to remove the language that mandated dismissal. *See Woodruff v. Ind. Fam. and Soc. Servs. Admin.*, 964 N.E.2d 784, 795 (Ind. 2012) ("Under most circumstances, 'an amendment changing a prior statute indicates a legislative intention that the meaning of the statute has changed.'" (quoting *United Nat'l Ins. Co. v. DePrizio,* 705 N.E.2d 455, 460 (Ind. 1999))).

[33] Turning to the facts at hand, the trial court appears to have determined that dismissal was required because DCS moved for dismissal before Z.H. was adjudicated a CHINS as to Mother. The trial court indicated that it believed DCS could do "a lot more" for Z.H. and expressed concern regarding the fact that Z.H. was living with Sister, who was not Z.H.'s legal guardian. Tr. Vol. II p. 11. The trial court was also concerned that Mother allegedly battered Z.H. while the CHINS proceedings were pending and just over a month before DCS filed its motion to dismiss. Nonetheless, the trial court observed that the case was "pre-fact finding as to [Mother]." *Id*. Indeed, the sole ground stated in the trial court's order granting the motion to dismiss was "[t]here has not been an adjudication as to Mother in this cause." Appellant's App. Vol. II p. 110.

[34] While we ordinarily "presume trial courts know and follow the law," we will overlook this presumption "if the trial court's order leads us to conclude that

'an unjustifiable risk exists that the trial court did not follow the applicable law.'" *In re Paternity of A.R.S.*, 198 N.E.3d 423, 431 (Ind. Ct. App. 2022) (quoting *Hecht v. Hecht*, 142 N.E.3d 1022, 1031 (Ind. Ct. App. 2020)). We find that to be the case here. Based on the record before us, the trial court's ruling is not in keeping with the dismissal statute. The dismissal statute draws no line between pre- and post-adjudication CHINS cases,[5] nor does it require dismissal under any circumstances. Rather, as we have explained, trial courts must determine whether dismissal is in the best interests of the child, and the trial court made no such determination here.

[35] DCS agrees that trial courts have discretion regarding whether to grant a motion to dismiss a CHINS case. DCS, however, argues that the trial court did not abuse its discretion here because "DCS no longer had evidence that [Z.H.] was endangered or that coercive intervention of the court was necessary." Appellee's Br. p. 16. DCS contends that: Z.H. "was being cared for by her adult sister[,] and Mother was in agreement with this plan"; "[p]lacement with an adult sibling is a sufficient permanency plan"; DCS did not have any safety concerns regarding Z.H. while in Sister's care; and Z.H. was already receiving therapy services through her school. *Id* at 18. DCS ultimately contends, "at the time of the dismissal, DCS was of the opinion that there was nothing more that it could do." *Id*. at 19.

---

[5] *K.B.*'s distinction between pre- and post- adjudication motions to dismiss applied to the previous version of the dismissal statute. We see no reason to carry forward that distinction here.

[36] We are not persuaded by DCS's arguments. First, the trial court appears to have determined that it had no discretion regarding whether to dismiss the CHINS case, and as a result, the trial court failed to determine whether dismissal was in Z.H.'s best interests.

[37] Moreover, DCS's assertions are unsupported by the record. Mother has continued to abuse and neglect Z.H. Mother and her boyfriend allegedly beat the Children in July 2022, causing the Children to run away. Mother allegedly struck Z.H. in the eye with a computer even after DCS became involved, and Mother faces pending felony charges for domestic battery based on these incidents. DCS alleged that the Children were CHINS under Indiana Code Sections 31-34-1-1 and 31-34-1-2. [6]

---

[6] Indiana Code Section 31-34-1-1 provides,

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

As relevant, here, Indiana Code Section 31-34-1-2 provides,

> (a) A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
>
> (2) the child needs care, treatment, or rehabilitation that:

[38] After the CHINS petition was filed and only one month before DCS filed its motion to dismiss, Mother allegedly spanked Z.H. with a belt, choked her, and ordered her to sleep on the floor because Z.H. did not follow Mother's bedtime rules and Mother "paid" for the bed. Appellant's App. Vol. II p. 98. Z.H. ran away, and Mother allegedly tracked Z.H. down and "nudged" her with her car. *Id.* at 99. When the GAL informed Mother that disciplining Z.H. with a belt was inappropriate, Mother responded, "I thought I just couldn't touch her with my hands." *Id.* at 98.

[39] Z.H. ended up staying with Sister, and Mother initially refused to provide Z.H.'s belongings. Mother eventually provided some of Z.H.'s belongings;

---

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

(b) A child is a child in need of services if, before the child becomes eighteen (18) years of age:

(1) the child is a victim of:

(A) an offense under IC 35-42-1-2.5  [assisting suicide]

(B) an offense under IC 35-42-2-1 [battery];

(C) an offense under IC 35-42-2-1.3 [domestic battery];

(D) an offense under IC 35-42-2-1.5 [aggravated battery];

(E) an offense under IC 35-42-2-9 [strangulation];

(F) an offense under IC 35-42-2-10 [female genital mutilation]; or

(G) an offense under IC 35-46-1-4 [neglect of a dependent];

(2) the offense described in subdivision (1) was committed by the parent, guardian, or custodian of the child; and

(3) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

\* \* \* \* \*

however, Mother had cut them with a knife or scissors. The allegations against Mother give this Court great pause, and we cannot accept DCS's assertion that Z.H. is no longer neglected and/or endangered.

[40] Furthermore, though Mother agreed to allow Z.H. to stay with Sister, this informal agreement hardly constitutes a sufficient permanency plan, as DCS contends. Pursuant to Indiana Code Section 31-34-21-7.5(c)(1), an adequate permanency plan must be one "the department or the court considers most appropriate and consistent with the best interests of the child." For placement with "an adult sibling" to constitute a sufficient permanency plan, that sibling must be "able and willing to act as the child's **permanent custodian** and carry out the responsibilities required by the permanency plan." Ind. Code § 31-34-21-7.5(c)(1)(C)(i) (emphasis added).

[41] Here, there is no adequate permanency plan in place for Z.H.[7] Mother has not agreed to allow Z.H. to stay with Sister for any firm timeline, let alone permanently. Further, Sister has not established guardianship of Z.H. Aside from a "limited release of information" with Z.H.'s school, Tr. Vol. II p. 8, Sister lacks the necessary authority to seek medical attention for Z.H., enroll Z.H. in school, and act as a legal custodian for Z.H. That authority still belongs to Mother, yet Mother refused to sign a safety plan to establish communication with Sister regarding Z.H.'s care, and Mother no longer communicates directly

---

[7] We note that, at least up until December 2022, DCS's permanency plan for Z.H. was reunification.

with Sister and Z.H. By dismissing Z.H.'s CHINS petition without the establishment of a guardianship, the trial court left Z.H. in the precarious position of having an abusive mother in charge of her physical, financial, emotional, and legal well-being.

[42] Finally, DCS's absurd assertion that "there was nothing more that it could do" hardly supports the trial court's dismissal order. Indeed, the trial court opined just the opposite, stating "I think there's a lot more [DCS] could do for [Z.H.]." Tr. Vol. II p. 11. DCS cannot abandon children in the naïve hope that everything will just work out when all indications show otherwise, and we cannot accept DCS's assertion that the trial court did not abuse its discretion by dismissing Z.H.'s CHINS case.

[43] Dismissal of a CHINS case must be in the best interests of the child. Before a trial court can dismiss a CHINS petition, at a minimum, the child needs a qualified legal custodian—an adult that has the legal authority and responsibility to care for the child's needs. Currently, Mother has that authority—which she has abused. The trial court misconstrued the dismissal statute and failed to determine whether dismissal was in Z.H.'s best interests. We reverse and remand with instructions that the trial court determine whether dismissal is in Z.H.'s best interests.

## Conclusion

The trial court erred by dismissing Z.H.'s CHINS case. Accordingly, we reverse and remand with instructions that the trial court determine whether dismissal is in Z.H.'s best interests.

Reversed and remanded.

Bailey, J., and Kenworthy, J., concur.